EMERGENCY FLEET CORPORATION, UNITED STATES SHIPPING BOARD *v.* WESTERN UNION TELEGRAPH COMPANY.

CERTIORARI TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 113. Argued December 2, 5, 1927.—Decided January 3, 1928.

1. The Fleet Corporation is a department of the government within the meaning of the Post Roads Act, and therefore entitled to the reduced rates fixed by the Postmaster General for telegraphic messages sent over the lines of companies which accepted its provisions, to officials and agents of government departments or to private parties on government business. Pp. 417, 426.

2. The practical construction of the Act in this regard is decisive of its meaning. P. 418.

3. The facts that the Fleet Corporation is in form a private corporation, that in sending messages it contracted on its own behalf and is suable on such contracts by the telegraph company, and that it competes in some of its operations with private shipping, *held* not inconsistent with its being a department of the government within the Post Roads Act in view of its relations, functional and fiscal, to the United States and considering that, if it paid full commercial rates, the burden would fall upon the government. Pp. 422–24.

4. The Act of June 18, 1910, in broadening the Interstate Commerce Act so as to include telegraph companies, did not abrogate or modify the scope or effect of the Post Roads Act with respect to the allowance of reduced rates to the government. P. 425.

13 F. (2d) 308, reversed.

CERTIORARI, 273 U. S. 681, to a judgment of the Court of Appeals of the District of Columbia, which affirmed a judgment recovered by the Telegraph Company from the Fleet Corporation in the Supreme Court of the District

of Columbia for the difference between the commercial and government rates on telegrams sent by the corporation.

Mr. Gardner P. Lloyd, Special Assistant to the Attorney General, with whom Solicitor General Mitchell, Mr. Chauncey G. Parker, General Counsel, U. S. Shipping Board, Mr. Ralph H. Hallett, Assistant Counsel, U. S. Shipping Board, and Mr. O. P. M. Brown, Special Counsel, U. S. Shipping Board, were on the brief, for petitioner.

Mr. John W. Davis, with whom Messrs. Francis R. Stark and Paul E. Lesh were on the brief, for respondent.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

By Post Roads Act, July 24, 1866, c. 230, 14 Stat. 221; Rev. Stat. §§ 5263–5266, the United States offered privileges of great value to any telegraph company which should elect to accept its provisions. In return, it required, by § 2 of the Act: " That telegraphic communications between the several departments of the government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the Postmaster-General." Each year since the passage of the Act the government rates have been so fixed. For the fiscal years beginning July 1, 1921, and July 1, 1922, they were fixed for domestic telegrams substantially at 40 per cent of the commercial rate; and for cablegrams at 50 per cent of the commercial rate.

The Western Union accepted the provisions of the Act on June 8, 1867. Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 1, 4; Telegraph Co. v. Texas, 105 U. S. 460. The Fleet Corporation was organ-

ized April 16, 1917. From that date to May, 1922, it was accorded, without question, the government rate on all messages sent by it. Then the Western Union claimed the right to the commercial rates for all its messages. The claim was resisted. Thereafter, messages of the Fleet Corporation continued to be marked by it " Government rate "; but they were received under an agreement that the acceptance of the message and of payment therefor at the government rate should be without prejudice to the right of the Western Union to recover the additional amount claimed. This suit was brought, in the Supreme Court of the District of Columbia, to recover, for the months of June and July, 1922, the difference between the amount paid and the commercial rate. Of this amount, $1,071.16 was for messages sent to some official or agent of the Fleet Corporation or of the Shipping Board or to some other department or official of the Government; $336.43, for messages addressed to private persons. A stipulation waiving the jury was filed; the case was heard on an "Agreed Statement of Facts "; the court found the facts to be as there stated; and a judgment entered for the full amount was affirmed by the Court of Appeals for the District. 13 F. (2d) 308. This Court granted a writ of certiorari, 273 U. S. 681.

The question whether messages transmitted for the Fleet Corporation after May 31, 1922, shall be paid for at the commercial rates or at the lower government rates is one of statutory construction. The Post Roads Act had been in force, without amendment, more than 55 years before the transactions here involved. Throughout that period, the rights of the Government and the Western Union concerning the transmission of messages had been governed by the Act, unaffected by any special contract; and there had been a uniform practice in applying it. That practice should be stated before discussing the specific facts relating to the Fleet Corporation. For the

construction given to the Act by the United States and acquiesced in by the Western Union, having been both contemporaneous and thereafter consistently and widely applied, is not only persuasive but, in our opinion, decisive of the case. *United States* v. *Alabama Great Southern R. R. Co.,* 142 U. S. 615. Compare *District of Columbia* v. *Gallaher,* 124 U. S. 505, 510.

Continuously since June 8, 1867, the Western Union has extended the right of priority in transmission and the government rate, not only to each of the Great Executive Departments presided over by a member of the Cabinet (and to the several bureaus, divisions and officers thereof), but also to the Judicial and the Legislative branches, to the government of the District of Columbia, and to the following corporations existing at the time of the passage of the Post Roads Act: the Smithsonian Institution, organized pursuant to Act of August 10, 1846, c. 178, 9 Stat. 102, and the National Home for Disabled Volunteers, organized pursuant to Acts of March 3, 1865, c. 91, 13 Stat. 509, and March 21, 1866, c. 21, 14 Stat. 10. The Western Union has also extended, from time to time, the same preferences to at least the following minor independent departments established after the date of the acceptance by it of the provisions of the Post Roads Act: Civil Service Commission, Act of January 16, 1883, c. 27, 22 Stat. 403; Interstate Commerce Commission, Act of February 4, 1887, c. 104, 24 Stat. 379, 383; Bureau of American Republics (now the Pan-American Union), Act of July 14, 1890, c. 706, 26 Stat. 272, 275; Panama Canal, Act of April 28, 1904, c. 1758, 33 Stat. 429; Federal Reserve Board, Act of December 23, 1913, c. 6, 38 Stat. 251, 260; Federal Trade Commission, Act of September 26, 1914, c. 311, 38 Stat. 717; Inter-American High Commission, United States Section, Act of February 7, 1916, c. 20, 39 Stat. 8; Bureau of Efficiency, Act of February 28, 1916,

c. 37, 39 Stat. 14, 15; United States Shipping Board, Act of September 7, 1916, c. 451, 39 Stat. 728, 729; United States Employees' Compensation Commission, Act of September 7, 1916, c. 458, 39 Stat. 742, 748; United States Tariff Commission, Act of September 8, 1916, c. 463, 39 Stat. 756, 795; Federal Board for Vocational Education, Act of February 23, 1917, c. 114, 39 Stat. 929, 932, Alien Property Custodian, Act of October 6, 1917, c. 106, 40 Stat. 411, 415; United States Railroad Administration, Act of March 21, 1918, c. 25, 40 Stat. 451, 455; War Finance Corporation, Act of April 5, 1918, c. 45, 40 Stat. 506; United States Interdepartmental Social Hygiene Board, Act of July 9, 1918, c. 143, 40 Stat. 845, 886; Railroad Labor Board, Act of February 28, 1920, c. 91, 41 Stat. 456, 470; Federal Power Commission, Act of June 10, 1920, c. 285, 41 Stat. 1063; General Accounting Office, Act of June 10, 1921, c. 18, 42 Stat. 20, 23; Veterans' Bureau, Act of June 7, 1924, c. 320, 43 Stat. 607, 608. So far as appears by the record, there has been no denial of the government rate at any time to any department, office, or division of the Government as organized, except that to the Fleet Corporation here in question.

The extension of the government rate to each of the above named departments was made by the Western Union, as a matter of course, upon application therefor by the Government and has been continued ever since. The government rate was applied to all messages sent on official business of the Government and chargeable to any of the departments named, whatever the nature of its organization, whatever its functions, and whatever the character of the official business. In extending priority and the lower rates, no distinction has ever been made between messages sent to persons within the several departments and those outside. And, obviously, the im-

portance to the United States of securing both priority and the lower rate for official messages sent by it, is the same whoever the addressee. Messages sent by the Government, but not on official business exclusively, have been paid for by the private person interested; and the payment has been made at the commercial rate.[1]

The Western Union has never questioned the right of the Shipping Board to the government rate on any official messages sent by it. It concedes that all the messages here in question relate to activities which the Shipping Board itself might legally have conducted; that all the messages were sent on its official business; that the Board was authorized by Congress to employ the Fleet Corporation as its agency to perform the particular activities in connection with which they were sent; that the messages were not to be paid for out of any segregated portion of Fleet Corporation money; that payment of the commercial rates would involve, indirectly, an additional charge on the public treasury; and that, so far as concerns the character of the message or of the business, the government rate was chargeable for all the messages, if for any of them. The claim that the government rates do not apply to messages of the Fleet Corporation is rested in part upon the fact that it is, in form, a private corporation; in part upon the fact that it is an agency of the Shipping Board, as distinguished from a bureau or division; in part upon the fact that, to a considerable extent,

---

[1] Thus, a Treasury Regulation, adopted April 2, 1918, provides: "(10) Government telegraph rates, established conformably to law, are intended to apply to official Government business exclusively, and no private individual, association, company, or corporation should in any way be benefited thereby. In cases where it becomes necessary to use the telegraph on any business in the special interest of any private person or persons, in which the Government has no interest, the party for whom the service is performed will be required to pay for the messages both ways at commercial rates." T. D. 37588.

it is engaged in a business which involves competition with
private ship owners.   These arguments do not support the
claim; but they make necessary a statement of the facts
concerning the organization and activities of the Fleet
Corporation.

The Fleet Corporation was organized by the United
States Shipping Board pursuant to specific authority con-
ferred by the Act of September 7, 1916, c. 451, § 11, 39
Stat. 728, 731.  The legislation concerning it, its relation
to the Shipping Board, its character and the scope of its
activities are shown in *The Lake Monroe,* 250 U. S. 246;
*United States* v. *Strang,* 254 U. S. 491; *Sloan Shipyards
Corporation* v. *United States Shipping Board Emergency
Fleet Corporation,* 258 U. S. 549; *United States* v. *Walter,*
263 U. S. 15; and *United States ex rel. Skinner & Eddy
Corporation* v. *McCarl, ante,* p. 1.  Besides powers con-
ferred upon the Fleet Corporation by the general corpora-
tion law of the District of Columbia, it was vested, by dele-
gation from the President, with the powers conferred upon
him by Acts of June 15, 1917, c. 29, 40 Stat. 182; April 22,
1918, c. 62, 40 Stat. 535; and November 4, 1918, c. 201, 40
Stat. 1020, 1022.   Executive Orders, No. 2664, July 11,
1917; No. 2888, June 18, 1918; No. 3018, December 3,
1918; No. 3145, August 11, 1919.   These specific powers
and duties were transferred to the Shipping Board by
Merchant Marine Act, 1920, June 5, 1920, c. 250, 41
Stat. 988.

Since the passage of the Merchant Marine Act, 1920, the
Fleet Corporation has been the agency through which the
Shipping Board has performed its principal functions.
The activities have consisted largely of maintaining and
liquidating property acquired for the United States during
the World War, of settling claims arising therefrom, and
of operating, or causing to be operated, vessels not dis-
posed of.   Besides other activities, the Fleet Corporation

has operated directly, and has been interested in the
operation of, vessels owned by the United States. Some
of these government vessels have been operated in compe-
tition with American vessels privately owned. But in
operating vessels, as in making sales, the Shipping Board
and the Fleet Corporation were required by the Merchant
Marine Act to proceed with a view to aiding in the de-
velopment of an adequate merchant marine to serve,
among other things, " as a naval and military auxiliary in
time of war or national emergency, ultimately to be owned
and operated privately by citizens of the United States."
These services of the Fleet Corporation were obviously of
a public nature. It has never done any business, or con-
ducted any operation, except on behalf of the United
States.

*First.* It is argued that the government rate should be
denied because the Fleet Corporation is a private corpora-
tion. In form, it is such. But all of its $50,000,000 cap-
ital stock was subscribed and paid for by the Shipping
Board on behalf of the United States. All has been so
held by it ever since. The United States alone has had
a financial interest in its capital stock. The United
States alone has contributed the additional money needed
from time to time for the conduct of its business. The
Fleet Corporation has, of course, received from others
moneys in payment for property sold, as charter hire, for
shipping services, or in settlement of claims. But, as the
business of the Fleet Corporation has been conducted con-
tinuously at a large loss, the sums so received did not
supply capital. They served merely to reduce, to that
extent, the amount of the deficit being incurred and, hence,
the amount of the additional money which the United
States was required to contribute.[2] Payment by the

---

[2] For the fiscal year ending June 30, 1921, the Shipping Board
reported a total excess of outgo over income (exclusive of appropria-
tions) of $188,291,441.05. Annual Report of United States Ship-

Fleet Corporation of the commercial rate for messages would necessarily increase the charges upon the public treasury to the same extent, and in the same manner, as would the charge of the commercial rate in respect to the business done for the United States directly by the Shipping Board or that done for it by some other department of the Government. An important, if not the chief, reason for employing a corporate agency was to enable the Government to employ commercial methods and to conduct the operations with a freedom supposed to be inconsistent with accountability to the Treasury under its established procedure and with its control over the financial operations of the United States. *United States ex rel. Skinner & Eddy Corporation* v. *McCarl, ante,* p. 1. It obviously was not the intention of the Government in employing a corporate agency to deprive itself of the right of priority of transmission and of the lower rate secured through the Post Roads Act.

*Second.* It is argued that in sending a message the Fleet Corporation contracted on its own behalf; that this contract gave to the Western Union the right to sue the corporation; and that by such contract there was secured the right to rely upon the credit of the corporation and to satisfy the debt out of its properties. All this may be admitted; but it affords no reason for denying that the Fleet Corporation is a department of the United States within the meaning of the Post Roads Act. Actually, the Fleet Corporation had no individual credit. As an agency of the Shipping Board it had control of certain properties and moneys required in the conduct of its

---

ping Board, 1921, p. 321. For the year ending June 30, 1922, the Board's excess was $56,374,951.22; that of the Fleet Corporation, $81,547,600.86. Annual Report, 1922, p. 238. In the year ending June 30, 1923, the excess for the Shipping Board and all its subsidiaries was $15,231,630.30; that for the Fleet Corporation taken alone, $41,682,514.86. Annual Report, 1923, p. 168.

business. But it had no actual capital. Long before
June 1, 1922, the $50,000,000 which the United States
supplied in payment of the capital stock, had been sunk
in the business.[3]   By, and pursuant to, Merchant Marine
Act, 1920, the title to most of the property used by the
Fleet Corporation was transferred to the Shipping Board
or to the United States. All moneys other than amounts
needed for current operation are required to be covered
into the Treasury of the United States. The Fleet Cor-
poration has had no means of paying either the large
outstanding claims against it or of paying the deficits con-
tinuously being incurred, other than the moneys supplied
by the United States through the annual appropriations.
It is, of course, immaterial that the charge upon the public
treasury is an indirect one; and the fact that the Fleet
Corporation receives some gross income from shipping
services is also without legal significance. Many depart-
ments receive fees, or some other form of compensation,
for services rendered to private persons. See 14 Opinions
of the Attorney-General, 278.

*Third.* It is argued that the Fleet Corporation should
be denied the government rate, because it competes, in re-
spect to some of its operations, with private shipping.
But in operating ships it is performing a function of the
Government. The conduct of business in competition

---

[3] The total receipts from appropriations and allotments to June 30,
1921, were $3,310,170,576.98. The net assets then on hand (after
deducting current and capital liabilities, reserves for depreciation,
etc.) were $1,929,847,381.84. Thus, the loss to date, as estimated by
the Shipping Board, was $1,380,323,195.14. Annual Report of United
States Shipping Board, 1921, pp. 309-321. By June 30, 1923, the
total appropriated and allotted had grown to $3,491,912,648.01, while
the Shipping Board's estimate of the net worth of the assets belong-
ing to it and its subsidiaries had shrunk to $292,405,200.17, showing
a loss of $3,199,507,447.84. Annual Report, 1923, pp. 192-196. The
estimates for June 30, 1927, show a net worth of $290,461,593.91,
making a net loss of $3,271,021,167.61 on the total appropriations
($3,561,482,761.52) to that date. Annual Report, 1927, pp. 121-124.

with private interests may of course, be for a public purpose, *Standard Oil Co.* v. *City of Lincoln* (*post*, p. 504). Other departments which compete with private business have long enjoyed the government rate without question. The Post Office has since 1872 competed with bankers through money orders; since 1910 with savings banks by receiving deposits on interest; since 1913 with express companies through the parcel post. The War Finance Corporation has since 1918 competed with the private bankers. The War Department has by its Mississippi River barge lines competed since 1920 with the railroads. Equally with all of these, the Fleet Corporation is acting for and on behalf of the United States.

*Fourth.* It is faintly argued that the Western Union is entitled to the commercial rates, because, since the Act of June 18, 1910, c. 309, § 7, 36 Stat. 539, 544, which broadened the scope of the Act to Regulate Commerce so as to include telegraph companies, telegraph rates are no longer a matter of contract; that they have the force of law, *Western Union Telegraph Company* v. *Esteve Brothers & Co.*, 256 U. S. 566; and that any deviation from the lawful rate would involve an undue preference to the Government and an unjust discrimination against its competitors, the private shipping concerns. It may be doubted whether the prescribed rule requiring equality of treatment would ever be violated by giving to the Government preferential rates. Compare *Nashville, Chattanooga & St. Louis Ry.* v. *Tennessee,* 262 U. S. 318. But it is a sufficient answer to say that it clearly was not the intention of Congress by the Act of 1910 to abrogate or modify the scope or affect the application of the Post Roads Act.

*Fifth.* It is urged that if the Fleet Corporation is granted the government rate, it may likewise be claimed by every instrumentality of the Government. Instrumentalities like the national banks or the federal reserve

banks, in which there are private interests, are not depart-
ments of the Government. They are private corporations
in which the Government has an interest. Compare *Bank
of the United States* v. *Planters' Bank,* 9 Wheat. 904, 907.
The Fleet Corporation is entitled to the government rate,
not because it is an instrumentality of the Government,
but because it is a department of the United States within
the meaning of the Post Roads Act. In respect to mes-
sages sent, on the Government's business, no distinction
can properly be made between those of the Shipping Board
and those of the Fleet Corporation.

                                                 *Reversed.*