## UNITED STATES v. NEW YORK, C. & ST. L. R. CO.

Circuit Court of Appeals, Sixth Circuit.
May 11, 1929.

No. 5148.

I. V. McPherson, of Washington, D. C. (A. E. Bernsteen, Howell Leuck, and Chauncey G. Parker, all of Cleveland, Ohio, and Lisle A. Smith, of Newark, N. J., on the brief), for the United States.

W. T. Kinder, of Cleveland, Ohio (Tolles, Hogsett & Ginn, George D. Bonebrake, and W. F. West, all of Cleveland, Ohio, on the brief), for appellee.

Before MOORMAN, HICKS, and HICKENLOOPER, Circuit Judges.

MOORMAN, Circuit Judge. Appellee sued the United States for an unpaid balance of $7,480 for railway mail service performed under designation of the Postmaster General. The government by answer admitted that this amount was due and owing appellee, but by way of set-off asserted claim against it for $2,433.69, alleged to be due the government for overcharges on shipments of fuel oil from Tulsa, Okl., to destination points in Ohio and Michigan. The court below denied the offset, and rendered judgment for the full amount of appellee's claim, with 6 per cent. interest thereon from June 30, 1924.

The shipments on which the overcharges were alleged to have been collected were made by the Emergency Fleet Corporation. Some of them were made on government bills of lading and others on commercial bills of lading. The originating carrier was a land grant railroad. Appellee, the delivering carrier, was not a land grant railroad, but was a party to a "freight land grant equalization agreement," which took effect January 5, 1915, and was in force and effect at the time the shipments were made. Appellee charged and collected from the Fleet Corporation the commercial rates on these shipments. The government contends that it should have collected only 50 per cent. of those rates, because such reduced rates would have been applicable to the transportation of the property by land grant roads, and under the equalization agreement appellee was bound to transport it for the same rates.

Under the grants made to the initial carrier of these shipments, 10 Stat. 8, as construed in Lake Superior & Mississippi R. Co. v. United States, 93 U. S. 442, 23 L. Ed. 965, and 14 Stat. 292, the matter of fixing rates for the transportation of government troops and property was left to the determination of Congress. Since the decision in the case just cited Congress has each year fixed the rates for army transportation on such railroads in its Army Appropriation Act at not exceeding 50 per cent. of the rates for like transportation performed for the public at large. Appellee obligated itself in the equalization agreement "to accept for the transportation of property moved by the Quartermaster's Department, United States Army, United States Interior Department, or United States Reclamation Service, and for which the United States government is lawfully entitled to reduced rates over land grant roads, the lowest net rates lawfully available as derived from deductions account of land grant distances from a lawful rate filed with the Interstate Commerce Commission, applying from point of origin to destination at time of movement."

For the purposes of this opinion we accept the hypotheses that the shipments were government property, and that the government may recover the overcharge if the Fleet Corporation could have done so (see Rus-

sell, etc., Co. v. United States [6 C. C. A.] 31 F.(2d) 826, decided April 8, 1929); and this brings us to the question,—to what government property did the equalization agreement apply? This inquiry is said to have two aspects: One consisting of implications arising from the specific inclusions in the agreement; the other resulting from references therein to the obligations of a land grant road. We perceive no conflict of obligation as between the two. As to the first, it is to be observed that appellee was bound to accept for transportation "property moved by" the three named departments of the government. What immediately follows this designation of departments merely further describes the property of those departments to which the reduced rates are to be applied. Thus the agreement relates solely to the property of three specified departments, and in this aspect is to be construed, we think, as excluding all other government property.

From the other point of view, that taken by the government, that the agreement covered all property which land grant roads were bound to transport at reduced rates, the result is not different. The Army Appropriation Act of 1919 (41 Stat. 104, 116) was in effect when the property moved. It fixed the rates for "army transportation" at not exceeding 50 per cent. of the rates charged private persons, and provided that those rates should be paid out of the money appropriated by the act. It specified only the transportation of troops, munitions of war, and military supplies. Here also the rule of expressio unius est exclusio alterius applies. So, notwithstanding the plenary powers that Congress had, within constitutional limitations, to fix the rates for government property on land grant roads, it did no more by the act of 1919, than fix maximum rates for the transportation of troops, munitions of war, and military supplies.

The case is entirely different from Emergency Fleet Corporation v. Western Union Tel. Co., 275 U. S. 415, 48 S. Ct. 198, 72 L. Ed. 345, where under congressional authority the Postmaster General fixed a comprehensive system of telegraph rates for all government departments, and the Shipping Board was held to be a department of the government within the meaning of the Post Road Act (47 USCA §§ 1–6). The question in that case was not whether the Western Union had accepted the Post Road Act, or whether the order of the Postmaster General applied to all departments of the government, but whether the Fleet Corporation was a department of the government. Here the latter hypothesis

is accepted, and the question is whether the equalization agreement applied to a particular department. Our view that it applied only to those departments which it specifically named has support in the construction which the government put upon it in 1924, when it entered into new agreements with various roads in which it took the pains to enumerate 48 of its departments to which the reduced rates should apply.

It is said for the government that, inasmuch as the Quartermaster General was made exclusively responsible for the transportation of government property by the act of 1884 (23 Stat. 111; 10 USCA § 73), the shipments in question must be regarded as having been made for the Quartermaster General's department. With this we cannot agree. The Fleet Corporation, although a governmental agency, had a distinct corporate entity. As such it was given enormous powers. Its officers controlled and managed its affairs, and it was itself engaged in the business of transporting government property; indeed, it was organized largely for that purpose. If, therefore, it had theretofore been true that the Quartermaster General had exclusive control over the transportation of government property, this later action of Congress would have resulted in the taking away from him of the power to control the transportation of the property of the Fleet Corporation.

The case was tried by the court below under a written waiver of jury. The government contends that the court erred in refusing to make a finding of fact as to whether by common consent of the parties the equalization agreement was modified and extended, prior to the shipments here involved, so as to entitle the government to the rates provided therein on the transportation of all its property, by whomsoever moved. The difficulty that the government encounters in this contention is that, while it pleaded such a modification of the agreement, it made no request for any such finding of fact. The result, of course, is that the question is not open to the government on this review.

The government did request the court to find that the officers of the government charged with the duty of transporting its property and paying the transportation charges therefor for many years had interpreted the tariff rates of the appellee as obligating it to transport all government property, by whomsoever moved, at land grant rates, and that appellee for many years had accepted all such property for transportation at these reduced rates. In argument, it was urged that this action of the appellee in

accepting lower rates estops it from claiming the higher rates on the shipments in question. The court did not make a finding of fact on this request, and there was an exception to the court's refusal to do so. This was not a request to find that there had been a modification of the contract, but a request to find that a certain practice had been followed, which operated, as contended by the government, as an estoppel against the charging and collecting of the higher rates on the shipments involved.

It cannot be denied that the refusal of a court to make a finding upon a disputed issue of fact, if the court's action be excepted to, may necessitate the reversal of the judgment and the remanding of the cause for a new hearing. Packer v. Whittier (C. C. A.) 91 F. 511; Towle v. Bank (C. C. A.) 153 F. 566; Border Gas Co. v. Windrow (C. C. A.) 3 F. (2d) 977; Wessel v. Phosphate Co. (C. C. A.) 13 F.(2d) 999. But such action is not required where the tendered issue is not a matter of pertinent or controlling significance. In the present case we may accept the government's request as a fact found, and still the appellee was not estopped from charging and collecting the full legal rates. It was not bound, by contract or otherwise, to charge less than those rates. It presented bills for and collected them. The fact that it had not always collected such rates did not preclude it from doing so in this instance. St. Louis, B. & M. R. Co. v. United States, 268 U. S. 169, 45 S. Ct. 472, 69 L. Ed. 899; Southern Pac. Co. v. United States, 268 U. S. 263, 45 S. Ct. 500, 69 L. Ed. 947.

As a further defense to the government's claim of set-off the appellee relied in its pleadings upon a provision of the Interstate Commerce Act (49 USCA § 16) which declares that actions at law for overcharges shall be commenced against carriers subject to the provisions of that act within three years from the time the cause of action accrues, and not thereafter. This plea raised an issue which we do not find it necessary to resolve, since we are convinced that the equalization agreement did not apply to the shipments involved, and that the failure of the court to make a finding of fact as to the practice alleged to have existed between the parties could not have affected the result, because, even if such practice existed, it did not preclude or estop the appellee from charging and collecting the lawfully greater rates.

■ There remains for consideration the question of interest. The lower court allowed interest at the rate of 6 per cent. per annum from June 30, 1924. This was the date on which the services for which the appellee sued were completed. The general rule undoubtedly is that interest is not allowable on claims against the government, except where there is an express contract obligation, or where it is definitely given by act of Congress. Cf. Boston Sand & Gravel Co. v. United States (C. C. A.) 19 F.(2d) 744; Tillson v. United States, 100 U. S. 43, 25 L. Ed. 543; Harvey v. United States, 113 U. S. 243, 5 S. Ct. 465, 28 L. Ed. 987; Standard Oil Co. v. United States, 267 U. S. 76, 45 S. Ct. 211, 69 L. Ed. 519; Phelps v. United States, 274 U. S. 341, 47 S. Ct. 611, 71 L. Ed. 1083.

■ Section 177 of the Judicial Code, as amended (28 U. S. C. [28 USCA] § 284), declares that, with certain exceptions not pertinent here, no interest shall be allowed on any claim up to the time of the rendition of judgment by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest. The jurisdiction invoked in the District Court was concurrent, it would seem, with that of the Court of Claims, and, except for the Act of March 3, 1875 (31 U. S. C. [31 USCA] § 227), this statute might preclude the allowance of interest up to the time of the rendition of the judgment in the District Court. The Act of March 3, 1875, however, provides that, when any final judgment is recovered against the United States, or other claim "duly allowed by legal authority," shall be presented to the Secretary of the Treasury for payment, and the claimant shall be indebted to the United States, but denies his indebtedness and refuses to consent to a set-off, the Secretary shall cause proceedings immediately to be commenced to enforce the claim of the government, and shall withhold payment of such amount of the judgment or claim due the claimant as shall be sufficient to cover all legal charges and costs of prosecuting the claim of the government to final judgment, and if in such action judgment shall be rendered against the government, or the amount recovered by it shall be less than the amount so withheld, the balance shall be paid over to such claimant by the Secretary, with 6 per cent. interest thereon for the time it was withheld.

This allowance of interest which the statute makes was obviously intended as compensation to the claimant for the unauthorized withholding of the payment of his claim. No question has ever been made as to the validity of appellee's claim. It was stipulated that it was due for services which appellee performed under its contract with

the government. It became due, presumably, nothing to the contrary appearing, at the conclusion of those services. Payment was then refused solely because of a debt which the government claimed was due to it on account of overcharges made more than four years before. The result is that the appellee has been deprived of the use of its money since June 30, 1924, because of an unauthorized attempt of the government to assert a set-off against its claim. The reasonable inference from these facts, in view of familiar departmental rules, is that the claim was "duly allowed by legal authority" at that time.

The judgment is affirmed.