## UNITED STATES v. MICHENER.

### No. 8477.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 7, 1945.

Decided Dec. 21, 1945.

Arthur T. Vanderbilt, of Newark, N. J. (Furst & Furst, G. Dixon Speakman and Herbert E. Armstrong, all of Newark, N. J., on the brief), for appellant.

Thorn Lord, of Newark, N. J. (Edgar H. Rossbach, U. S. Atty., of Newark, N. J., on the brief), for appellee.

Before MARIS, GOODRICH and O'CONNELL, Circuit Judges.

O'CONNELL, Circuit Judge.

This is an appeal from the judgment of the District Court for New Jersey sentencing Russell W. Michener, after conviction by a jury, on twelve counts charging acts in violation of Section 35(A) of the U. S. Criminal Code.[1]

Michener, one Gregory Ferend, and the Marine Maintenance Corporation were indicted on conspiracy charges based upon alleged violations of the same statute and each defendant was individually indicted on twelve counts, charging, in substance, that each defendant knowingly and wilfully made and presented false, fraudulent, and fictitious claims against the United States Maritime Commission in the nature of billings, vouchers, and invoices for conversion and repair work done by the defendant Corporation on each of twelve ships pursuant to an arrangement with the Maritime Commission.

Ferend was president and the sole stockholder of Marine Maintenance Corporation

---

[1] 18 U.S.C.A. § 80. "Whoever shall make or cause to be made or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, any claim upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent; or whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

of which Michener was a salaried treasurer. On January 5, 1942, the Maritime Commission sent the first of the twelve ships to the yard of the Corporation for repair and conversion to an armed merchant vessel. Between January 5, 1942 and October 23, 1942, the yard completed the work on the twelve ships. Nothing in the indictment charges that the work was done improperly or that inferior materials were used, or that the completion of the work was untimely. The arrangement under which this work (called "defensing" the ships) was done, in effect, was such that the defendants were told to get the ships out and argue over charges later. In any event, defensing of the first of the twelve ships began before agreement was reached upon the terms under which the work on the vessels was to be done. Later, a contract was drafted which provided for payment to the corporation at the following rate: (a) $1.74 per each hour of labor; (b) hire of tools at cost plus 10 per cent; and (c) material at cost plus 10 per cent.

The ships themselves were of two types. Some were operated by the War Shipping Administration. Others were operated by our Allies under the provisions of the Lend Lease Act, 22 U.S.C.A. § 411 et seq. The work done on each ship also fell into two categories. Certain repairs were regarded as "overhead" and were to be charged to the owners of the vessels rather than to the Maritime Commission. The arming costs were to be charged to the Commission.

Apart from the speed with which the work was required to be done because of the fortunes of war, the administration of the yard appears to have been haphazard and improvised. This was caused by the mushrooming of facilities and marked expansion and turnover in personnel.[2] Furthermore, there was no time to set up an office force adequate to administer the multitude of complex problems. The job of instituting the system of timekeeping, material requisitioning, and various recordings essential to work of this kind fell to defendant Michener. His mission was to keep all the records straight in order that the Corporation might be paid the proper sums by the Commission and the owners for the work done on the ships in accordance with the basic arrangement.

It would appear that despite all of Michener's efforts to set up a workable system, the conditions which actually prevailed were hectic at best and chaotic at worst. Although the work in the yard began in January, no auditors from the Maritime Commission reported there for duty until August. In the interim many questions arose, such as whether certain items should be charged to the owners of the vessels or to the Commission. Having no Commission auditor to consult, Michener communicated with the New York office of the Commission in order to obtain the answers to these questions. He was advised to insert the doubtful items in the bill and that when the Commission auditor arrived at the yard there would be an adjustment. What happened to the defendant Michener from that point on followed with the swift inevitability of a Greek tragedy. Charged with the responsibility of doing what was virtually an impossibility under the circumstances, the preparation of proper claims against the Maritime Commission and the owners, he set out to obtain figures which would at least bear a semblance to reality. Interviews with foremen and timekeepers resulted in his making certain changes in the haphazard records. Items were recharged in certain instances to the Commission, in others to the owners. These alterations were obvious. No attempt was made to conceal them. Two auditors from the Commission ultimately took over and immediately objected to a large number of items charged to the Commission. Unable to reach agreement with Michener, they reported to their superior officer who proceeded to hold conferences with a public accountant retained by another corporation owned by defendant Ferend. They concluded that it was impossible to straighten out the accounts so long as Michener was treasurer of the Corporation. As a result, Michener was persuaded to resign in November, 1942. The Commission auditors and the new representative of the Marine Maintenance Corporation had no better success in reaching agreement on the disputed charges to the Commission. In January, 1943, the indictment in this case was handed down.

After a trial lasting several weeks, the jury made no finding with respect to the Corporation, whereupon the court directed them to render a verdict of not guilty as to the Corporation. The jury acquitted Ferend on all counts but, at the same time, found Michener guilty on the twelve counts

---

[2] The number of yard personnel increased from 100 to 1800.

charging violations of the false claims statute. From this conviction and judgment of the District Court sentencing him, Michener appeals.

We are required to set aside the conviction because of substantial error in the trial of the case.

■ The Government put on the stand the two Maritime Commission auditors, Rice and Day, who arrived at the yard in August of 1942. These auditors undoubtedly made detailed inspections of the books, records and accounts of the Marine Maintenance Corporation and were qualified to testify in summary form of what was contained in those voluminous documents. However, they were permitted to go further and state their conclusions that certain items were improperly charged to the Commission, basing their opinions not on what the records revealed but in many cases on matters entirely dehors the documents themselves. In considering numerous items, the auditors based their conclusions that charges were either excessive or that they should never have been made against the Commission upon statements allegedly made to them by persons not on the witness stand and who, in certain instances, were totally unidentified. The admission into the evidence of the auditors' conclusions and opinions as distinguished from mere statements of fact summarizing what was observed by them in the records was erroneous: Cooper v. United States, 8 Cir., 1925, 9 F.2d 216; Continental Casualty Co. v. First Nat. Bank, 5 Cir., 1941, 116 F.2d 885, 135 A.L.R. 1141. Illustrative of the lack of probe worthiness of the testimony of these auditors is the statement by Rice on direct examination that in conducting his audit he would check with a "gentleman at 45 Broadway" to determine if certain material had in fact been delivered. Based upon the information received from him the particular charge would be allowed or excluded. This amounted, in effect, to a decision by some unknown party on the very vital issue of the propriety of the particular charge. Unacceptable are such anonymous, unauthenticated conclusions. Another example of the auditors' method of arriving at the conclusions, admission of which we hold to be objectionable in itself, was the disallowance of all items charged to the Commission where the face of the record or document showed that originally it had been charged to the owner of the vessel. No effort was made to determine, and indeed no interest was ever shown in the real issue: whether the erasure or alteration was made to correct errors so as to set forth the true facts. We conclude that the trial judge erred in admitting the testimony of the two Maritime Commission auditors in the form in which such evidence was given.

The trial judge erred in another important respect. The Government placed two witnesses on the stand whose testimony undoubtedly was in the nature of a surprise to Government counsel. In each case he proceeded to neutralize that testimony by showing or attempting to show a previous inconsistent statement. The trial judge advised Government counsel to withdraw the first of these two witnesses, stating, "You may withdraw this witness and his testimony will be declared completely neutralized and I instruct the jury to pay no attention to anything he has testified." Similarly, in the case of the other Government witness he instructed the jury as follows: "The testimony, ladies and gentlemen of the jury, of this witness will be completely disregarded by you. It has been neutralized and will be by you for nothing held. I ask you to obliterate it as far as possible from your memories and in any event, if this case gets to the point where you consider it and consider all of the evidence you will exclude definitely and completely from your consideration any and all of the testimony of this witness. You will step down and wait in the back of the Court."

■■ This procedure raises an interesting question bearing on the nature of allowable impeachment of one's own witness. Appellant does not contend that the trial court erred in permitting the Government counsel to discredit his own witness by interrogating him on prior contradictory statements. This was within the bounds of the discretionary power of the trial judge. United States v. Maggio, 3 Cir., 1942, 126 F.2d 155, where Judge Maris discusses the development of modification of the strict rule against impeachment of one's own witness.[3]

---

[3] The early courts frequently rejected the notion that the proponent of a witness could impeach his own witness. See for example, headnotes to United States v. Jones, 1813, Fed.Cas.No.15,494. For the historical origin of this inhibition, which appears to be based on the theory that he who calls a witness "sponsors"

■ After a party is "surprised" by what his own witness says under oath, and is permitted by the trial judge to discredit the testimony in chief, does the opposing party have the right to cross-examine the witness? While there appear to be no decisions on this specific point, it would seem clear that such a right of cross-examination exists.[4] Cross-examination is a matter of right: The Ottawa, 1865, 70 U.S. 268; Alford v. United States, 1931, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624. That this right is not limited to such cross-examination which will necessarily tend to discredit the testimony in chief is apparent from the Alford decision. "To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial." Alford v. United States, 1931, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624, per the present Chief Justice.

■ It is further clear that in the usual case, not involving impeachment of one's own witness, where prior inconsistent statements are shown, the witness must be given an opportunity to explain away the apparent contradictions, if such a reconciliation be possible: Conrad v. Griffey, 1853, 57 U.S. 38, 16 How. 38, 14 L.Ed. 835; The Charles Morgan, 1885, 115 U.S. 69, 5 S.Ct. 1172, 29 L.Ed. 316; Southern Transp. Co. v. Ashford, 5 Cir., 1931, 48 F. 2d 191; 3 Wigmore, Evidence, Sec. 1044. Since, in the case at bar, Government counsel's objective (after being "surprised" by what his witnesses said on the stand) was to *discredit* the testimony in chief, it remained for the defense counsel to bring out, by means of further questioning, any explanation which might weaken or eliminate entirely the apparent inconsistencies shown by Government counsel. It is no answer that defendant might have called these witnesses as his own at a later phase of the proceedings. Heard v. United States, 8 Cir., 1919, 255 F. 829. We conclude, therefore, that defense counsel should have been permitted to cross-examine these two Government witnesses to elicit, if possible, statements tending to reconcile the apparent contradictions. To deny him such right, over protest, was reversible error.

■ Furthermore, by directing the jury to disregard completely the testimony of these two witnesses, the trial judge erroneously withdrew from the jury its function of weighing the effect of the prior in-

---

him, see Ladd, "Impeachment of One's Own Witness—New Developments", 4 U. of Chi.L.Rev. 69, and 3 Wigmore on Evidence, Sec. 897. The Federal courts early modified this rule, allowing interrogation on inconsistent prior statements by the party who called the witness in order to "refresh his recollection". Hickory v. United States, 1894, 151 U. S. 303, 14 S.Ct. 334, 38 L.Ed. 170. The general Federal practice is, in accord with United States v. Maggio, 3 Cir., 1942, 126 F.2d 155, to permit within the discretion of the trial judge, a party who is "surprised" in fact by what his witness tells while under oath and in court to interrogate the witness on prior inconsistent statements in order to discredit the testimony in chief. (See cases collected in footnote 4 of United States v. Maggio, supra.)

However, the doctrine permitting impeachment of one's own witness under circumstances of actual surprise cannot be used as a ruse or a device with which to put into the evidence what would otherwise be clearly inadmissible hearsay statements: Kuhn v. United States, 9 Cir., 1928, 24 F.2d 910; Young v. United States, 5 Cir., 1938, 97 F.2d 200, 117 A.L.R. 316. In both these cases counsel for the Government put on the stand witnesses he knew would testify adversely to him in order to "impeach" them by interrogation on numerous inconsistent statements made previously. These contradictory statements were clearly hearsay, prejudicial and obviously inadmissible. Government counsel apparently believed he could sustain their admission into the evidence under the "impeachment" doctrine. The courts, however, refused to sanction such practice. Cf. United States v. Block, 2 Cir., 1937, 88 F.2d 618. See also Ellis v. United States, 8 Cir., 1943, 138 F.2d 612, and United States v. Biener, D.C.E.D.Pa.1943, 52 F.Supp. 54.

4 3 Wigmore, Evidence, Sec. 1018. "But the theory of the hearsay rule is that an extra-judicial statement is rejected because it was made out of court by an absent person not subject to cross-examination. Here, however, by hypothesis the witness is present and subject to cross-examination. There is ample opportunity to test him as to the basis for his former statement."

consistent statements on the testimony in chief of these witnesses.[5] Schneider v. United States, 3 Cir., 1932, 57 F.2d 454, 457, where the Court stated, "We think the effect of an admission of having testified in another suit to the contrary of the witness's testimony in the suit on trial, is for the jury under proper instructions. * * * It was not for the court to instruct the jury to utterly disregard the witness's testimony." In the learned trial judge's view, one piece of testimony "neutralized" another leaving no part of it to be considered by the jury. Pieces of evidence do not, like the action of chemical elements, so "neutralize" each other. In a trial by jury, it is for the jury to determine the weight to be given to each piece of evidence properly admitted, particularly where the question at issue is the credibility of the witness. Cf. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

At the conclusion of the Government's case, the trial judge admitted into the evidence all of the corporate records which were present in the court room. These consisted of a multitude of time sheets, requisitions, accounts, and a mass of other documents. Some had been referred to specifically. Others had not even been mentioned, a great portion of which related to contracts not here in issue. Many contained notations and remarks, completely unauthenticated, which must have been prejudicial to the defense. Such notations as "balance fictitious", "rewritten", "rewritten—incomplete", "disallow", "no payroll entry", among numerous others, suffice to illustrate the type of material that was thus permitted to be placed before the jury.

Further, it is difficult to understand how the admission into the evidence of these files en masse (they were contained in cabinets two feet by four and a half feet and occupied a space twenty feet along a wall in the court room) could have aided the jury in reaching a sound, clearcut decision as to the facts in this case. Whatever confusion might have existed previously in the minds of the jurors, we believe would have been compounded as well as confounded by the admission of such a mass of material into the evidence. We are unable to approve of such indiscriminate depositing of masses of corporate records into the evidence. Cf. Oxford Paper Co. v. United States, 1932, 52 F.2d 1008, 56 F.2d 895, 74 Ct.Cl. 295. Apart from the question of the hearsay quality of notations contained on the records, which might easily have barred their admission if each document had been scrutinized carefully, we believe the rule of materiality itself would preclude such a practice as was followed by the trial judge. In Bates v. Preble, 1894, 151 U.S. 149, 14 S.Ct. 277, 38 L.Ed. 106, only certain sheets of a memo book were material and admissible in evidence. The trial judge allowed the entire book to go to the jury without sealing off the nonmaterial pages which also contained prejudicial matter. This was held to be reversible error. As to the prejudicial character of the notations placed on many of the documents contained in the files, see in addition to Bates v. Preble, supra, United States v. Dressler, 7 Cir., 1940, 112 F.2d 972, where a fingerprint card of the defendant, which was unobjectionable to prove fingerprints, was admitted into the

---

[5] Despite the weight of Wigmore's criticism to the contrary (3 Wigmore, Evidence Sec. 1018 (b), the present state of the law limits the use of the prior inconsistent statements to discrediting the testimony in chief. The prior contradictory statements are not affirmative evidence of what they assert. Southern R. Co. v. Gray, 1916, 241 U.S. 333, 36 S.Ct. 558, 60 L.Ed. 1030; New York Life Ins. Co. v. Bacalis, 5 Cir., 1938, 94 F.2d 200; Woody v. Utah Power & Light Co., 10 Cir., 1931, 54 F.2d 220; but cf. United States ex rel. Ng Kee Wong v. Corsi, 2 Cir., 1933, 65 F.2d 564, and United States v. Freundlich, 2 Cir., 1938, 95 F.2d 376.

This is also the law of the New Jersey State Courts: State v. D'Adame, 1913, 84 N.J.L. 386, 86 A. 414, Ann.Cas.1914B, 1109, followed by a long line of cases which speak of the limitation to the introduction of such prior contradictory statements to "neutralize" or discredit the testimony in chief. They do not, however, go so far as to permit the trial judge to withdraw from the jury the question of the credibility of the witness, as was done in the instant case. See, for example, State v. Kysilka, 85 N.J.L. 712, 714, 90 A. 309, 311, where the court explains the "neutralization" doctrine of State v. D'Adame, pointing out the requirement that in such case where the trial judge permits impeachment of one's own witness by prior inconsistent statements, he "should give ample warning against its consideration by the jury except for its limited purpose."

evidence. After the jury brought in its verdict of guilty it was noticed that the reverse side of the card contained remarks in the nature of a criminal history of the accused. This was held to be reversible error. The court pointed out that on appeal it was not possible to estimate what effect such material had on the jury. So, too, here we are unable to evaluate the effect which these notations may have had on the jury's verdict. We therefore hold the admission of the files en masse without regard to the propriety. of each document contained therein was reversible error.

■■ We believe our rulings on these points are dispositive of this appeal. However, since a new trial is ordered, reference will be made to appellant's attack on the indictment itself. It is contended that the indictment lacks sufficiency and particularity. We reject this contention. The indictment meets the "obvious requirements" (1) that the accused shall be definitely informed as to the charges against him so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against other prosecutions for the same offense. Berger v. United States, 1935, 295 U.S. 78, 55 S. Ct. 629, 79 L.Ed. 1314. In any event, counsel availed himself of the privilege of the bill of particulars and thereby obtained sufficient information to enable him to prepare his defense adequately.

■ The indictment was further attacked on the ground that the Grand Jury which returned it lacked the power to act because the term of court in which it was drawn expired. It is argued that because the Grand Jury was impanelled during the November term at Newark, its powers to act were automatically terminated by the opening of a new term of court in Trenton in the following January, and that, consequently, the indictment handed down subsequent to the opening of the new term in Trenton was void. With this we do not agree. Merely because a new term opens in another place in the District does not bring about a termination of a previously existing term in another place in the same District. Our decision in United States v. Perlstein, 3 Cir., 1942, 126 F.2d 789, certiorari denied, 1942, 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752, affirming Judge Maris' decision in D.C.N.J.1941, 39 F.Supp. 965, is controlling.

■ Appellant's contention that knowingly presenting a false and fraudulent claim for approval and payment by and to the U. S. Maritime Commission is not made criminal under section 35(A) of the U.S. Criminal Code, 18 U.S.C.A. § 80, because it is not a "department" of the United States is without merit. The Maritime Commission was specifically designated an agency of the United States, 46 U.S.C.A. § 1111, and is the transferee of all privileges, powers, and duties vested in the former United States Shipping Board, 46 U.S.C.A. § 1114. The Supreme Court has held, per Mr. Justice Brandeis, that the Emergency Fleet Corporation (organized by the U. S. Shipping Board pursuant to Act of Congress of September 7, 1916, c. 451, Sec. 11, 39 Stat. 728, 731, 46 U.S.C.A. § 810 and the agency through which the Shipping Board has performed its principal functions) is a "department" of the United States for the purposes of the application of the Post Roads Act. United States Shipping Board Emergency Fleet Corp. v. Western Union Telegraph Co., 1928, 275 U.S. 415, 48 S.Ct. 198, 72 L.Ed. 345. The Emergency Fleet Corp. decision is dispositive of this point.

Because of the errors in trial procedure alluded to, the judgment of the district court is reversed and the cause is remanded to that court for a new trial.