244 F.2d 27
 UNITED STATES of America, Appellant,
v.
R. S. RAINWATER, Sr., Sloan Rainwater, Jr., William
Rainwater, as individuals and as partners, d/b/a
R. S. Rainwater & Sons, Appellees.
UNITED STATES of America, Appellant,
v.
CITIZENS NATIONAL BANK, Walnut Ridge, Arkansas, Appellee.
 Nos. 15659, 15660.
 United States Court of Appeals Eighth Circuit.
 May 3, 1957.
Rehearing Denied June 17, 1957.
 
 Marcus A. Rowden, Atty., Dept. of Justice, Washington, D.C. (George Cochran Doub, Asst. Atty. Gen., Osro Cobb, U.S. Atty., Little Rock, Ark., and Samuel D. Slade, Atty., Dept. of Justice, Washington, D.C., were with him on the brief), for appellant.
 Catlett & Henderson, Little Rock, Ark., filed brief for appellees.
 Before WOODROUGH, VOGEL and VAN OOSTERHOUT, Circuit Judges.
 VOGEL, Circuit Judge.
 
 
 1
 The United States brought two separate actions under the Federal False Claims Act, §§ 3490-3492 and § 5438 of the Revised Statutes, 31 U.S.C.A. §§ 231-233. Both actions were based on alleged false representations made to the Commodity Credit Corporation for the purpose of obtaining loans on cotton. The cases were consolidated and will be treated jointly. Subsequent to the consolidation the defendants made motions to dismiss on two grounds: 1, Lack of jurisdiction of the subject matter; 2, failure to state a claim upon which relief could be granted. Without writing an opinion setting forth its reasons, the District Court granted dismissal and the government brings these appeals.
 
 
 2
 The briefs and arguments of counsel are confined to two propositions: One, do false claims submitted to wholly owned government corporations, such as Commodity Credit Corporation, come within the purview of the False Claims Act as claims 'against the Government of the United States, or any department or officer thereof'? Two, do the complaints state facts upon which relief may be granted where there has been no specific allegation of damage?
 
 
 3
 The second question requires no prolonged discussion. The complaints, after setting forth in detail the manner in which the defendants procured the 'payment and allowance of false and fraudulent claims', (loans on cotton) pray for judgment 'for the amounts provided for in 31 U.S.C. 231'. 31 U.S.C.A. § 231, being the False Claims Act under which the actions were commenced, provides that the persons doing any of the prohibited acts 'shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages'. Accordingly, it cannot be said, as claimed by the defendants, that there was no allegation of damage. Certainly by inference, at least, the government asks that in addition to the sum of $2,000.00 it recover double the amount of its damages. Irrespective of that, we believe that even if no damages were shown at the time of trial the United States could still recover the statutorily fixed sum of $2,000.00 for each of the proscribed acts. United States v. Rohleder, 3 Cir., 1946, 157 F.2d 126, 129; United States ex rel. Marcus v. Hess, D.C.Pa., 1941, 41 F.Supp. 197, affirmed 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443. We hold that defendants' second point of contention is unsound.
 
 
 4
 It is with the first proposition that difficulty arises. The False Claims Act, § 3490 of the Revised Statutes, was passed in 1863:
 
 
 5
 'Sec. 3490. Any person * * * who shall do or commit any of the acts prohibited by any of the provisions of section fifty-four hundred and thirty-eight, Title 'Crimes,' shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit.'
 
 
 6
 The foregoing § 3490 has never been amended, but R.S. § 5438, the criminal section referred to therein, has been amended. Prior to the amendment of R.S. § 5438 it, insofar as may be pertinent herein, was as follows:
 
 
 7
 'Sec. 5438. Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim * * * shall be imprisoned * * *.' (Emphasis supplied.)
 
 
 8
 While § 5438 was subsequently amended to include 'any corporation in which the United States of America is a stockholder', it is well established that subsequent alteration or repeal of a statute previously incorporated by reference in a second statute does not affect the incorporating statute. United States ex rel. Kessler v. Mercur Corp., 2 Cir., 1938, 83 F.2d 178, 180:
 
 
 9
 'While section 5438 was amended, repealed, and finally since the time when it was referred to in section 3490 superseded by a broader enactment (18 U.S.C.A. § 80), it stands, so far as section 3490 is concerned, as it was written when incorporated by reference. * * * It is well settled that where a statute incorporates another, and the one incorporated is thereafter amended or repealed, the scope of the incorporating statute remains intact and 'no subsequent legislation has ever been supposed to affect it.' Kendall v. United States, 12 Pet. 524, 625, 9 L.Ed. 1181; In re Heath, 144 U.S. 92, 93, 94, 12 S.Ct. 615, 36 L.Ed. 358.'
 
 
 10
 Succinctly stated, then, our question is: Do false claims submitted to the Commodity Credit Corporation, a wholly owned government corporation, come within the meaning of the Federal False Claims Act as being 'upon or against the Government of the United States, or any department or officer thereof'?
 
 
 11
 In a very recent case, United States v. McNinch, 242 F.2d 359, 362, the Court of Appeals for the Fourth Circuit held that a claim against a government corporation which acts as an agency of the government is not a claim against the government of the United States or a department of officer thereof, '* * * as required by R.S. § 5438 as a condition of liability at the time of the adoption of R.S. § 3490'. It held that the language of the statute was not broad enough to cover such claims. The court gave consideration to the fact that the language of R.S. § 3490 was not amended when amendments were made in the language of R.S. § 5438 (the criminal statute) to cover the making of false claims against corporations in which the government was a stockholder. It stated, 242 F.2d at page 364:
 
 
 12
 'If it were the intent of Congress that presentation of false claims against such corporations be redressed by actions for civil penalties or forfeitures, it would have been easy enough to have so provided when the statutes were enacted providing the criminal penalties. Such action by Congress would certainly be more logical and seemly then for the courts to give a forced interpretation to a statute passed three quarters of a century ago when government corporations had not been dreamed of.'
 
 
 13
 We find ourselves in disagreement with the Fourth Circuit case and must decline to follow it. Until United States v. McNinch, no case had so held. United States ex rel. Salzman v. Salant & Salant, Inc., D.C.N.Y., 1938, 41 F.Supp. 196, cited by the appellees is not in point as it involves the Red Cross, whose funds are in no sense the property of the United States. In addition to the cases reversed by McNinch, the District Court for the Southern District of New York, in United States v. Samuel Dunkel & Co., Inc., D.C.N.Y., 1945, 61 F.Supp. 697, 699, in dealing with alleged frauds in connection with the sale of dried eggs to the Federal Surplus Commodities Corporation, held:
 
 
 14
 'The obvious purpose and intent of this statute (Section 231 of Title 31 U.S.C.A., R.S. §§ 3490 and 5438) was to reach any person who knowingly caused or assisted in causing the Government to pay claims which were grounded in fraud, without regard to whether the person had direct contractual relations with the Government, as well as those who receive money from the Government as a result of their fraud. There is not to be so strict a construction as urged by the defendants.'
 
 
 15
 We rely mainly, however, upon United States ex rel. Marcus v. Hess, 1943, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443, (cited in the Samuel Dunkel case). In doing so, we shall attempt to point out that the ultimate source of payment of the fraudulent claims was the federal treasury and when so viewed there can be no distinction between a government corporation or the government itself being defrauded. In Marcus v. Hess, supra, the Supreme Court was dealing with the same Acts with which we are here concerned. There the respondents had made claims with local governmental units rather than with the United States government, but a substantial portion of their pay came from the United States for work on PWA projects. The court stated, 317 U.S. at page 542, 63 S.Ct. at page 383:
 
 
 16
 'We think the conduct of these respondents comes well within the prohibition of the statute which includes 'every person who * * * causes to be presented, for payment * * * any claim upon or against the Government of the United States * * * knowing such claim to be * * * fraudulent.' This can best be seen upon consideration of the exact nature of respondent's relation to the government. The contracts found to have been induced by the respondents' frauds were made between them and local municipalities and school districts of Allegheny County, Pennsylvania. A large portion of the money paid the respondents under these contracts was federal in origin, granted by the Federal Public Works Administrator, an official of the United States. 40 U.S.C. 401(a).' (Emphasis supplied.)
 
 
 17
 Here, all of the money paid defendants was 'federal in origin'. In fact, we do not believe it ever lost federal identity. In reversing the Circuit Court in Marcus v. Hess, the Supreme Court stated, 317 U.S. at page 544, 63 S.Ct. at page 384:
 
 
 18
 'Government money is as truly expended whether by checks drawn directly against the Treasury to the ultimate recipient or by grants in aid to states. While at the time of the passage of the original 1863 Act, federal aid to states consisted primarily of land grants, in subsequent years the state aid program has grown so that in 1941 approximately 10% of all federal money was distributed in this form. These funds are as much in need of protection from fraudulent claims as any other federal money and the statute does not make the extent of their safeguard dependent upon the bookkeeping devices used for their distribution. The Senatorial sponsor of this bill broadly asserted that its object was to provide protection against those who would 'cheat the United States.' The fraud here could not have been any more of an effort to cheat the United States if there had been no state intermediary.'
 
 
 19
 The same is true here except instead of a 'state intermediary' we have a wholly owned government corporation set up as a 'bookkeeping device' for the handling of government money. After quoting portions of the statute, the Supreme Court continued:
 
 
 20
 'These provisions, considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.'
 
 
 21
 The Commodity Credit Corporation is actually an instrumentality of the United States 'within the Department of Agriculture'. 15 U.S.C.A. § 714. Its entire original capital of $100,000,000.00 was supplied by the United States. 15 U.S.C.A. § 714e. The Secretary of the Treasury must make an annual appraisal of the net worth of Commodity Credit Corporation and if the net worth is less than $100,000,000.00 the treasury must restore the amount of capital impairment. 15 U.S.C.A. § 713a-1. If the appraisal indicates an excess, the treasury receives such excess. 15 U.S.C.A. § 713a-2. Commodity Credit Corporation is authorized to borrow up to $14,500,000,000.00 on the credit of the United States to carry out its statutory programs of making loans on agricultural commodities. 15 U.S.C.A. § 713a-4. It seems to us, then, that both as a matter of form and as a matter of substance the alleged false claims were claims against the government of the United States and a department (Department of Agriculture) thereof. The creation of the Commodity Credit Corporation for the handling of government loans on agricultural commodities was a 'bookkeeping device' and that fact cannot cover up the substance of that with which we deal. The false claims here were against money appropriated by Congress from the treasury of the United States, to be used in carrying out a governmental purpose. If that money were exhausted, Congress had arranged for Commodity Credit to borrow on the credit of the United States. As stated by the Supreme Court in Marcus v. Hess, supra, 'these funds are as much in need of protection from fraudulent claims as any other federal money and the statute does not make the extent of their safeguard dependent upon the bookkeeping devices used for their distribution'. If the object of the statute was to protect against those who would cheat the United States, then to our minds it is applicable to the instant situation.
 
 
 22
 In Marcus v. Hess, supra, the claims were against local municipalities and school districts, but such claims were to be paid from a joint bank account containing both federal and local funds. We believe that situation to be farther removed from the strict statutory language 'upon or against the Government of the United States, or any department or officer thereof' than is the situation with which we here deal-- a wholly owned governmental corporation set up as a bookkeeping expediency whose entire funds are appropriated by the United States, whose profits, if any, go into the treasury of the United States, whose losses are reimbursed from the treasury, and whose actions are binding upon the United States to the extent of many times its capital assets.
 
 
 23
 In addition to Marcus v. Hess, supra, we believe the Supreme Court's attitude toward wholly owned government corporations has been reflected in a number of other cases which indicate a tendency to disregard corporate form as a stratagem for the evasion of realities. In Inland Waterways Corp. v. Young, 1940, 309 U.S. 517, 524, 60 S.Ct. 646, 650, 84 L.Ed. 901, the Supreme Court said:
 
 
 24
 'The true nature of these modern devices (government corporations) for carrying out governmental functions is recognized in other legal relations when realities become decisive. Compare Clallam County v. United States, 263 U.S. 341, 44 S.Ct. 121, 68 L.Ed. 328; (United States Shipping Board) Emergency Fleet Corp. v. Western Union, 275 U.S. 415, 48 S.Ct. 198, 72 L.Ed. 345. The funds of these corporations are, for all practical purposes, Government funds; the losses, if losses there be, are the Government's losses.' United States Board Shipping Emergency Fleet Corp. v. Western Union, 1928, 275 U.S. 415, 422, 423, 48 S.Ct. 198, 201, 72 L.Ed. 345:
 
 
 25
 'It is argued that the government rate should be denied because the Fleet Corporation is a private corporation. In form, it is such. But all of its $50,000,000 capital stock was subscribed and paid for by the Shipping Board on behalf of the United States. All has been so held by it ever since. The United States alone has had a financial interest in its capital stock. The United States alone has contributed the additional money needed from time to time for the conduct of its business. * * *
 
 
 26
 '* * *. It obviously was not the intention of the Government in employing a corporate agency to deprive itself of the right of priority of transmission and of the lower rates secured through the Post Roads Act (47 U.S.C.A. § 1-3, 6).'In Cherry Cotton Mills v. United States, 1946, 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835, the Supreme Court held that in a suit against the United States the latter could counterclaim for debts owed a government corporation (Reconstruction Finance Corporation), the corporation being considered the government of the United States within the meaning of the counterclaim statute. In speaking of the Reconstruction Finance Corporation, it stated:
 
 
 27
 'Its Directors are appointed by the President and affirmed by the Senate; its activities are all aimed at accomplishing a public purpose; all of its money comes from the Government; its profits if any go to the Government; its losses the Government must bear. That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely Governmental purposes.'
 
 
 28
 With equal force it can be said here of the Commodity Credit Corporation that 'its Directors are appointed by the President and affirmed by the Senate; its activities are all aimed at accomplishing a public purpose; all of its money comes from the Government; its profits if any go to the Government; its losses the Government must bear' and 'that the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely Governmental purposes'-- that of making loans on agricultural commodities to support the economy of the nation. We do not believe therefore that it requires a forced construction to hold that false claims filed against Commodity Credit Corporation fall within the meaning of the Federal False Claims Act as being claims 'upon or against the Government of the United States, or any department of officer thereof'. We are not dealing with the criminal aspect of a statute requiring 'utmost strictness' in construction. The Circuit Court in the Marcus v. Hess case, supra, construed this particular statute with 'utmost strictness'. In reversing, the Supreme Court specifically repudiated that 'interpretative approach'. We are dealing with a civil statute providing forfeitures for the making of false claims paid by the government. It was the fair intendment of Congress to include claims where the source of payment was the treasury of the United States. As we have seen, state intermediaries, such as local municipalities and school districts, do not constitute a bar. We cannot see how an intermediary such as a wholly owned governmental corporation could cause such false claims to escape the embrace of the statute.
 
 
 29
 These cases are reversed and remanded for trial.