## SOUTHERN PAC. CO. v. RECONSTRUCTION FINANCE CORPORATION.
### No. 11352.

Circuit Court of Appeals, Ninth Circuit.
April 1, 1947.

C. O. Amonette and Charles W. Burkett, Jr., both of San Francisco, Cal., for appellant.

Louis V. Crowley, H. Rowan Gaither, Jr., and Cooley, Crowley, Gaither & Dana, all of San Francisco, Cal., for appellee.

Before GARRECHT, HEALY, and BONE, Circuit Judges.

GARRECHT, Circuit Judge.

The appellant sued the Defense Supplies Corporation, hereinafter referred to as Supplies, for $23,049.51, which is the difference between transportation charges of $56,736.14, based on the duly published and filed rates, and the sum of $33,686.63 paid by Supplies for the transportation of tank car shipments of motor benzol during 1942 and 1943, from Seattle, Washington, to Los Angeles and Vernon, California.

Prior to July 1, 1945, Supplies was a corporation duly created by the appellee at the request of the Federal Loan Administrator with the approval of the President, pursuant to authority contained in § 5d of the Reconstruction Finance Corporation Act, as amended, 15 U.S.C.A. § 606b (3).

As of July 1, 1945, Supplies was dissolved and the appellee was made subject to all its liabilities. Act June 30, 1945, 59 Stat. 310, 15 U.S.C.A. § 606b note. On November 5, 1945, the court below entered an order continuing this action against the appellee, substituting it as defendant in the place of Supplies.

The facts were stipulated. From a judgment in favor of the appellee, the present appeal has been taken. 64 F.Supp. 605.

In its answer, Supplies denied liability for the sum of $23,049.51, claiming that it was entitled to make land-grant deductions in that amount from the aggregate of the transportation charges, on the ground that the benzol was, at the time of transportation, "military or naval property of the United States moving for military or naval and not for civil use", within the meaning of § 321(a), Title III, Part II, of the Transportation Act of 1940, c. 722, 54 Stat. 954, 49 U.S.C.A. § 65(a). That section provided in part as follows: "Sec. 321. (a) Notwithstanding any other provision of law, but subject to the provisions of sections 1 (7) and 22 of the Interstate Commerce Act, as amended, the full applicable commercial rates, fares, or charges shall be paid for transportation by any common carrier subject to such Act of any persons or property for the United States, or on its behalf, except that the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for

civil use or to the transportation of members of the military or naval forces of the United States (or of property of such members) when such members are traveling on official duty;  *  *  *".

The United States owns all of the appellee's capital stock, and the appellee in turn owned all of the capital stock of Supplies, whose charter stated that it was "an instrumentality of the United States Government". The appellee itself is a corporate agency of the Government. Reconstruction Finance Corporation v. Menihan Corporation, 312 U.S. 81, 83, 61 S.Ct. 485, 85 L.Ed. 595.

At all times material to this action the accounts of Supplies were not audited, settled or adjusted by the General Accounting Office of the United States.

On April 2, 1942, the War Production Board recommended that Supplies "purchase at least 50 million gallons of motor grade benzol as quickly as practicable to be allocated for defense purposes." The recommendation for purchase by Supplies of such a "stockpile" was subsequently increased to 65,000,000 gallons.

The shipments involved in the present suit consisted of 944,032 gallons, more or less, of motor benzol purchased by Supplies from the Seattle Gas Company, of Seattle, from time to time between June, 1942, and November, 1943. At the times of said transportation the benzol was the property of Supplies. Each purchase was made by Supplies pursuant to allocations by the War Production Board. The shipments were on Government bills of lading, each marked "For Military Use", and showing Supplies as consignor and consignee. Upon arrival at their destination, the various shipments were stored for Supplies at the Vernon tank farm of the Wilshire Oil Company, Inc.

Of the motor benzol involved in this action, 13.4% was used in the manufacture of rubber products sold for civilian uses pursuant to allocations by the War Production Board. The rest of the benzol was used for the manufacture of rubber products and 100-octane aviation gasoline sold to the Army and Navy.

The appellant's argument is divided into three propositions:

1. The motor benzol was not property of the United States, but of Supplies, a corporate entity separate and distinct from the United States.

2. The motor benzol was not military or naval property of the United States.

3. The motor benzol was not, at the time of its transportation, moving for military or naval use.

The first proposition requires separate consideration: the other two may be treated jointly.

1. *The Benzol Was the Property of the United States*

Ownership by Supplies was tantamount to ownership by the United States. The very first paragraph of the charter by which the appellee created Supplies, stamps upon the latter an indelible Governmental brand: "In order to aid the Government of the United States in its national-defense program, Reconstruction Finance Corporation hereby declares:  *  *  *."

No other purpose is set forth in this three-line preamble. The charter also lists six specific "objects, purposes and powers of the Corporation", each of which is directly and obviously connected with national defense.

Similar Federal corporations—some of them not so closely concerned with national defense— have been characterized by the Supreme Court as being Government agencies, functioning as Government instrumentalities, and standing in the place of the Government within the ambit of their delegated powers.

In Clallam County v. United States, 263 U.S. 341, 344, 345, 44 S.Ct. 121, 68 L.Ed. 328, Mr. Justice Holmes used the following language:

"In short the Spruce Production Corporation was organized by the United States as an instrumentality for carrying on the war, all its property was conveyed to it by or bought with money coming from the United States and was used by it solely as means to that end, and when the war was over it stopped its work except so far as it found it necessary to go on in order to wind up its affairs.  *  *  *

*  *  *  *  *  *

"This is not like the case of a corporation having its own purposes as well as those of the United States and interested in profit on its own account. The incorporation and formal erection of a new personality was only for the convenience of the United States to carry out its ends."

In Emergency Fleet Corporation v. Western Union Telegraph Co., 275 U.S. 415, 422, 48 S.Ct. 198, 201, 72 L.Ed. 345, Mr. Justice Brandeis said:

"These services of the Fleet Corporation were obviously of a public nature. It has never done any business, or conducted any operation, except on behalf of the United States.

"First. It is argued that the government [telegraph] rate should be denied because the Fleet Corporation is a private corporation. In form, it is such. But all of its $50,000,000 capital stock was subscribed and paid for by the Shipping Board on behalf of the United States. All has been so held by it ever since. The United States alone has had a financial interest in its capital stock. * * * Payment by the Fleet Corporation of the commercial rate for messages would necessarily increase the charges upon the public treasury to the same extent, and in the same manner, as would the charge of the commercial rate in respect to the business done for the United States directly by the Shipping Board or that done for it by some other department of the government. * * * It obviously was not the intention of the government in employing a corporate agency to deprive itself of the right of priority of transmission and of the lower rate secured through the Post Roads Act [47 U.S.C.A. § 1 et seq.]."

Citing the two opinions from which we have just quoted, the court observed in Inland Waterways Corporation v. Young, 309 U.S. 517, 524, 60 S.Ct. 646, 650, 84 L. Ed. 901: "The true nature of these modern devices for carrying out governmental functions is recognized in other legal relations when realities become decisive. * * * The funds of these corporations are, for all practical purposes, Government funds; the losses, if losses there be, are the Government's losses."

Of the present appellee itself, the Supreme Court, in Cherry Cotton Mills v. United States, 327 U.S. 536, 539, 66 S.Ct. 729, 730, said a year ago: "Its Directors are appointed by the President and affirmed by the Senate; its activities are all aimed at accomplishing a public purpose; all of its money comes from the Government; its profits if any go to the Government; its losses the Government must bear."

See also King County, Wash., v. United States Shipping Board E. F. Corporation, 9 Cir., 282 F. 950, 952, 953; United States Shipping Board E. F. Corporation v. Delaware County, Pa., 3 Cir., 17 F.2d 40, certiorari denied, 278 U.S. 607, 49 S.Ct. 12, 73 L.Ed. 533.

The identity of interest existing between Supplies itself and the United States has already been recognized by the courts. In Defense Supplies Corporation v. United States Lines Co., D.C.N.Y., 57 F.Supp. 291, 293, the court said:

"The only reason for libellant's [Supplies'] existence, like that of the United States Grain Corporation, was that the Government, through its corporate form, might more readily and easily than would otherwise be possible, engage in activities that were designed and intended to be part and parcel of the war effort. * * *

"Title to the wool in question, although it stood in the name of libellant, was intended solely for the Government's emergency stock pile—the creation of this was distinctly a war measure. The wool, all technical questions of title aside, was in reality the property of the United States, and was to be used for the benefit of the Government, at such time and manner as the appropriate official might decide upon. * * * Any loss of libellant, just as losses of Inland Waterways Corporation, would ultimately be borne by the Government."

In affirming the decision from which we have just quoted, the Circuit Court for the Second Circuit observed: "It seems clear to us that the complete ownership of the Defense Supplies Corporation by the United States shows this to be nothing more than an action by the United States against the United States." 2 Cir., 148 F.2d 311,

312, certiorari denied, 326 U.S. 746, 747, 66 S.Ct. 43.

Accordingly, from the charter of Supplies and from decisions construing that charter as well as those of comparable Government corporations, we conclude that there was such identity of interest and function between Supplies and the United States that ownership of the benzol by Supplies was equivalent to ownership by the United States.

### 2. The Benzol Was Military or Naval Property Moving for Military or Naval Use.

Properly to evaluate the character of the shipments in question, it is necessary to examine the work of Supplies in its actual milieu.

On August 29, 1940, when Supplies received its charter, France had fallen and Hitler was rapidly completing the forging of his "Fortress Europa". President Roosevelt and other far-sighted statesmen realized that the United States would inevitably be drawn into the vortex of war—and soon. Prompt and vigorous defense measures were necessary. The creation of a "stockpile" of vital war materials was imperative.

In the argument before this court, counsel for the appellant emphasized that the benzol in question was only a part of a "stockpile"—as if the creation of a stockpile was not an indispensable step in preparing for a global war! The same point is also lightly touched on in the appellant's reply brief. A stockpile of raw material behind the lines to be used in the manufacture or propulsion of a fighter plane is as truly war material as a completed fighter plane which is at that moment engaging aircraft overhead. Military strategists plan their moves far ahead. Lost indeed is the nation that wages war from hand to mouth!

In July, 1942, when the shipments in question began moving, the blow had already fallen. The distant menace had become a present peril. The attack upon Pearl Harbor was a fresh and hideous memory. Mortal danger faced the nation, its inhabitants, and its corporations—including the appellant itself.

In such a crisis, little importance is to be attached to the fact that 13.4% of raw material purchased primarily for the prosecution of the war, happened eventually to be manufactured into products sold for civilian uses pursuant to allocations by the War Production Board. Stockpiles amassed by the Army and the Navy in the defense of the nation are not to be scrutinized with a microscope when we seek to arrive at the general purpose of their accumulation.

In our view, the opinion of the Supreme Court in the case of Northern Pacific Railway Co. v. United States, 1947, 67 S.Ct. 747, 749, is determinative of the issue here presented as to whether or not the motor benzol was military or naval property moving for military or naval use.

In that case, unlike the one now before us, it was admitted that the material and equipment involved was government property at the time of carriage. For that reason we have not cited it in support of the first proposition considered in the present opinion. The opinion is, however, we think, conclusive authority for this second proposition.

In that case, the shipments involved five types of property: (1) Copper cable transported to Tacoma, Wash., for use in the installation of degaussing equipment (a defense against magnetic mines) on a cargo vessel being so built that it might readily be converted into a military or naval auxiliary; (2) lumber for construction of a munitions plant in Minnesota; (3) lumber for construction in Minnesota of Marine Corps pontons; (4) bowling alley equipment moved to Seattle for reshipment to the Naval Air Base, Dutch Harbor, Alaska; and (5) liquid paving asphalt transported to Seattle for reshipment to Alaska, for use in constructing runways at an airport at Cold Bay under a program of the Civil Aeronautics Authority approved by a joint cabinet board as being necessary for the national defense.

Two of the arguments most earnestly pressed by the appellant herein are that the motor benzol "never was military or naval property of the United States—it was merely a material which ultimately became a part of property subsequently acquired by the United States for military or naval

use"; and that the finished products "became military or naval property of the United States only when they were acquired by the United States through its War and Navy Departments for use by the Army and Navy."

In developing its first point—namely, that the benzol was only a "material" from which a finished war product was made—the appellant seeks to fashion a reductio ad absurdum of the House-That-Jack-Built variety: "At most it was a strategic or critical material suitable for use, *in connection with other materials,* in the manufacture or production of materials suitable for use, *in connection with still other materials,* in the manufacture or production of 100 octane aviation gasoline and of styrene for use, *in connection with still other materials,* in the manufacture or production of synthetic rubber." [Emphasis supplied.]

The opinion in the Northern Pacific case, supra, completely disposes of both of these points made by the present appellant:

"There is a suggestion that since the shipment of asphalt was to a civilian agency, the Civil Aeronautics Authority, it was not 'military or naval' property. The theory is that 'military or naval' property means only property shipped by or under control of the army or navy.

"We see no merit in that suggestion. Section 321 (a) makes no reference to specific agencies or departments of government. The fact that the War or Navy Department does the procurement might, of course, carry special weight or be decisive in close cases. But it is well known that procurement of military supplies or war material is often handled by agencies other than the War and Navy Departments. Procurement of cargo and transport vessels by the Maritime Commission is an outstanding example. * * * And shortly before the Transportation Act of 1940 was enacted, Congress by the Act of June 25, 1940, 54 Stat. 572, 573, 574 [supra], authorized the Reconstruction Finance Corporation to create subsidiary corporations to purchase and produce equipment, supplies and machinery for the manufacture of arms, ammunition, and implements of war. And later that Act was amended to enable those corporations to purchase or produce any supply or article necessary for the national defense or war effort. Act of June 10, 1941, 55 Stat. 248, 249 * * *.

"It is the relation of the shipment to the military or naval effort that is controlling under § 321 (a). The property in question may have to be reconditioned, repaired, *processed or treated in some other way before it serves their needs. But that does not detract from its status as military or naval property.*"

*It is highly significant that the Supreme Court at this juncture, in connection with the language that we have italicized above, cites with approval the present case in the court below—the very case that the appellant would have us reverse.*

Continuing, the Supreme Court says: "Within the meaning of § 321 (a) an intermediate manufacturing phase cannot be said to have an essential 'civil' aspect, when the products or articles involved are destined to serve military or naval needs. *It is the dominant purpose for which the manufacturing or processing activity is carried on that is controlling.*" [Emphasis supplied.]

The Supreme Court closes with a note of admonition regarding the canons of construction that should apply in a case of this kind: "But it is a familiar rule that where there is any doubt as to the meaning of a statute which 'operates as a grant of public property to an individual, or the relinquishment of a public interest,' the doubt should be resolved in favor of the Government and against the private claimant. [Cases cited.] That rule has been applied in construing the reduced rate conditions of the land-grant legislation. [Cases cited.] That principle is applicable here where the Congress, by writing into § 321 (a) an exception, retained for the United States an economic privilege of great value."

The judgment is affirmed.