## BERESLAVSKY v. STANDARD OIL CO. OF NEW JERSEY.

### Civil Action No. 2300.

United States District Court
D. Maryland.

Feb. 1, 1949.

Daniel B. Leonard, of Baltimore, Md., and Pennie, Edmonds, Morton, & Barrows and W. Brown Morton, Jr., all of New York City, for plaintiff.

William L. Marbury and Franklin G. Allen, both of Baltimore, Md., and Theodore S. Kenyon and Malvin R. Mandelbaum, both of New York City, for defendant.

COLEMAN, Chief Judge.

This is a suit under R.S. 4919, 35 U.S. C.A. § 67, to recover damages for the alleged infringement of patent No. 1,713,589, issued to plaintiff for an invention in fuels for internal combustion engines. Defendant has moved under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., for a summary judgment as to an important part of the plaintiff's claim. The question presented by this motion is the only question now before the Court. For the purposes of the motion the material facts have been stipulated by the parties and the question for decision is solely one of law.

The defendant's motor fuel charged to infringe plaintiff's patent consisted of two types: (1) A motor fuel for use in aircraft engines known as "100 octane gasoline", and (2) motor fuels for non-aviation uses known as "motor gasoline." Defendant claims that plaintiff's remedy insofar as it relates to all of defendant's "100 octane gasoline" and also to so much of defendant's "motor gasoline" as was sold to the United States Government lies exclusively in the jurisdiction of the Court of Claims by reason of the provisions of Section 1498 of the new Judicial Code, 28 U.S.C.A. § 1498, and that, therefore, defendant is entitled to a dismissal to that extent of the complaint in the present proceeding.

Plaintiff opposes the motion for summary judgment on two grounds: First, that there is no evidence that the alleged infringement of plaintiff's patent was necessitated either expressly or by implication by the terms of the contract under which the aviation fuels were purchased by the Defense Supplies Corporation; and second, that such purchase was not sufficient to transform the manufacture of the fuels into a "manufacture * * * for the United States" within the meaning of the provisions of 35 U.S.C.A. § 68, which was repealed and reenacted as Section 1498 of the new Judicial Code, with certain changes hereinafter referred to.

The material facts as stipulated by the parties are as follows: The motor fuels as to which infringement is charged are those, and only those, which contained hydrocarbon fractions produced by catalytic cracking and commercially fractionated to include hydrocarbons boiling between 320° F. and 335° F. Prior to the date of expiration of the patent in suit, that is, May 21, 1946, defendant manufactured or initially sold in the District of Maryland only two types of motor fuel containing such fraction, namely, (a) a motor fuel intended for use in aircraft engines and technically known as "100 octane gasoline"; and (b) motor fuels intended for non-aviation use.

On January 13, 1942, the defendant entered into an agreement with Defense Supplies Corporation, an instrumentality of

the United States Government, having among its functions the purchase of supplies, including aviation gasoline required for national defense and the prosecution of the War. Pursuant to this agreement, the defendant transferred title to, and billed Defense Supplies Corporation for all of its 100 octane gasoline.

The Petroleum Administration for War (in which term is included its predecessor agencies, Office of Petroleum Coordinator for National Defense and Office of Petroleum Coordinator for War), a duly constituted agency of the United States Government, had among its functions the coordination of the activities of other Governmental agencies pertaining to specifications and manufacture of petroleum products for defense and war purposes, and served as liaison between other agencies of the Government and the various branches of the petroleum industry, including the petroleum refining industry. The duly authorized employees of this Governmental agency had full knowledge of the precise character of the defendant's 100 octane aviation gasoline as well as its gasoline manufactured for non-aviation uses, and it authorized, recommended, and encouraged the inclusion of the particular fraction above referred to in defendant's 100 octane gasoline, and it likewise authorized, recommended, and encouraged the inclusion of various petroleum fractions in the ordinary commercial products of defendant.

The Petroleum Administration for War was immediately notified by the plaintiff when the present suit was filed, and took no steps thereafter to disapprove the inclusion of the particular fraction in defendant's 100 octane gasoline, although the Petroleum Administration for War was advised that the alleged infringement was based on the presence in this type of gasoline of a fraction produced by catalytic cracking and containing mesitylene. It also knew that so much of this fraction as was not used by defendant for blending into 100 octane gasoline was added to defendant's motor gasoline, which was principally used as a fuel for motor vehicles, and some of which was sold to various agencies of the Government.

Some eight million gallons of the approximately two hundred and ten million gallons of 100 octane aviation gasoline containing the particular fraction, initially sold by the Defendant to Defense Supplies Corporation in the District of Maryland, were resold by Defense Supplies Corporation to defendant without physical delivery or appropriation. This gasoline was thereafter sold by defendant for its own account to private customers having allocations for such gasoline approved by the Aviation Petroleum Products Allocation Committee. The price per gallon paid by defendant to Defense Supplies Corporation, on re-purchase, was higher than the price paid originally by Defense Supplies Corporation to the defendant. Approximately five hundred and twenty-one thousand gallons of this 100 octane gasoline initially sold by the defendant to Defense Supplies Corporation in the District of Maryland was resold by Defense Supplies Corporation itself to private purchasers having allocations for such gasoline approved by the Aviation Petroleum Products Allocation Committee, and was delivered to such purchasers from defendant's possession without physical delivery or appropriation prior to the physical delivery or appropriation to or for their account.

The remainder, or about 96% of defendant's 100 octane gasoline containing the particular fraction which was sold to Defense Supplies Corporation and not disposed of in either manner just indicated, went to our armed forces, either directly from Defense Supplies Corporation, or from defendant after repurchase from the latter.

The object of defendant's motion for summary judgment is to eliminate from the present proceeding the question (1) whether the "100 octane gasoline" was an infringing product, and (2) the matter of damages respecting all sales of defendant's motor fuel to the Government. That it is proper to raise and determine such questions by a motion for summary judgment is well established. See Sperry Gyroscope Co. v. Arma Engineering Co., 271 U.S. 232, 46 S.Ct. 505, 70 L.Ed. 922; Broome v. Hardie-Tynes Mfg. Co., 5 Cir., 92 F.2d

886; Tinnerman Products v. Adel Precision Products, D. C., 62 F.Supp. 348; Hazeltine Corporation v. General Electric Co., D. C., 19 F.Supp. 898. In the latter case this Court heard separately, prior to the full trial on the merits, the question whether any acts of patent infringement had been committed within the District of Maryland, and being satisfied that defendant's sales in this District were to the Government, dismissed the complaint, relying upon the Act here involved as it stood before codification. The pertinent part of this Act is substantially the same as that contained in the Act's codification, effective September 1, 1948, 28 U.S.C.A. § 1498, upon which defendant relies, and which is as follows: "The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States for the recovery of the reasonable and entire compensation for the use or manufacture of an invention covered by a patent of the United States which has been used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same."

In a repealer section of the new codification there is a proviso that any rights or liabilities, existing under any section at the time of its repeal, are not affected. However, even though plaintiff is entitled to have his rights determined by the Act as it stood before codification, and even though this codification changes somewhat the Act's phraseology, there is really no change in meaning. It is essentially a question merely of verbal rearrangement. Before codification, the Act read, 35 U.S.C.A. § 68: "Whenever an invention described in and covered by a patent of the United States shall be used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, such owner's remedy shall be by suit against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture: * * * Provided further, That in any such suit the United States may avail itself of any and all defenses, general or special, that might be pleaded by a defendant in an action for infringement, as

set forth in this chapter, or otherwise." This was the Act of July 1, 1918, c. 114, 40 Stat. 705, which amended the Act of June 25, 1910, c. 423, 36 Stat. 851. Thus, both before and after the codification, the Act clearly indicates that use or manufacture "by or for the United States" of an article covered by a patent is sufficient to limit the patentee's remedy for infringement exclusively to a suit against the United States in the Court of Claims. Now, just as prior to the codification, the Court of Claims has jurisdiction to render judgment for the recovery by the patentee of his "reasonable and entire compensation" for such use and manufacture. There are the controlling words in both enactments, thus making the prescribed remedy against the United States exclusive of any other remedy against the manufacturer. The word "exclusive" does not appear in either enactment. See Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303; Western Electric Company v. Hammond, 1 Cir., 135 F.2d 283. Although the statute does not, either in its old or present form, in terms include *sales* to the Government, such is necessarily implied. Transfer of title includes acceptance of the article, and necessarily implies its use by the United States. Insofar as the statute's application is concerned, it is immaterial whether the United States actually used the present defendant's gasoline in Army or Navy planes, stored it away or otherwise disposed of it, although it is stipulated that all but about 4% of defendant's "100 octane gasoline" went to the armed forces and also, that this 4% was transferred either by the defendant or by Defense Supplies Corporation, under Government allocation, to private persons.

In Richmond Screw Anchor Co. v. United States, supra, the Supreme Court said, 275 U.S. 331, at page 343, 48 S.Ct. 194, at page 197, 72 L.Ed. 303: "The purpose of the amendment [by the Act of July 1, 1918] was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government, and to limit the owner of the patent and his assigns and all claiming through or under him to suit against the United States in the

Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture. *The word 'entire' emphasizes the exclusive and comprehensive character of the remedy provided. As the Solicitor General says in his brief with respect to the act, it is more than a waiver of immunity and effects an assumption of liability by the government."* (Emphasis supplied.)

As previously stated, plaintiff's first major ground of opposition to the motion is based upon the claim that there is no evidence that the alleged infringement of plaintiff's patent was called for, either expressly or by necessary implication, by the terms of the contract under which defendant sold its aviation fuels to the Defense Supplies Corporation.

The sum and substance of plaintiff's contention is that defendant could have met all of the Government's contract requirements without infringing the patent here in issue; that is to say, that defendant could have supplied gasoline that did not read on this patent, and yet would have fully met the contract specifications. But this contention is not supported by the stipulated facts, or the affidavits that are before the Court in support of defendant's motion. There can be no doubt that the Government caused the defendant to construct the plant which produced the particular type of gasoline, so that the Government might be assured of maximum production of that type.

■ Turning to plaintiff's second contention, it is, as we have seen, that the purchase of the gasoline by the Defendant Supplies Corporation did not transform its manufacture into a "manufacture for the United States", especially since a substantial portion of the gasoline was not used by the Government. It is contended that to approve defendant's position would result in establishing a rule that a mere sale of goods to the Government, after they have been manufactured, will retroactively relieve the manufacturer of liability for patent infringement by operation of the statute here involved. In other words, plaintiff claims it would permit the successful tracing of infringing goods through a series of sales on the open market into the

hands of the Government and thereby release from all liability for patent infringement a manufacturer who had, when his connection with the goods was terminated, not the least suspicion that they were ever to be used by the United States. Plaintiff argues that this statute, by substantial uniformity of court decisions, has been construed as a method to enable the Government to condemn for public purposes whatever patent rights it may manifest an intention to condemn, but not as a charter of freedom for Government contractors whereby they may extract private profit from their own infringement of patents by shifting their liability for such infringement to the public purse.

■ Plaintiff asserts that Section 6 of the Royalty Adjustment Act of October 31, 1942, 35 U.S.C.A. § 94, supports its position. The primary purpose of that Act was to reduce royalties for which the Government was ultimately liable on inventions manufactured for it by a licensee, from pre-war rates to rates appropriate to the volume of production in wartime. Section 6 provides that " * * * for the purposes of section 68 of this title [The Court of Claims Act], the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States." Plaintiff contends that while one object of this statute was to broaden the Court of Claims' statute by bringing within the latter's scope a class of persons not previously covered, namely, sub-contractors, it is also clear, since this later enactment, that an infringement, to be covered by the Court of Claims statute, must itself be made with the express authorization or consent of the Government, since Congress expressly made this requirement applicable not merely to the newly included class of persons, but to all persons who might assert that their use or manufacture of the alleged infringing goods was for the Government.

We are satisfied that there is no merit in this contention. The facts as disclosed by

944

the stipulation and affidavits annexed to defendant's motion have already been sufficiently referred to to indicate that the 100 octane gasoline here in question was not only manufactured for · the Government but at its express request and that this request involved the inclusion of the particular components that were included in its manufacture. The same is true with respect to so much of defendant's motor gasoline as was sold to the Government and which is involved in the present suit.

■ A substantial portion of all of the gasoline here involved was delivered by the defendant to the Government after the present suit was filed. Thus it is perfectly obvious that the Government knew the precise situation. If there were any merit in plaintiff's argument, namely, that an intention to condemn on the part of the Government is a prerequisite to application of the statute, then the plaintiff would have been entitled to obtain an injunction during the War against the defendant, but it is perfectly obvious that an attempt to do so would not have been successful.

■ Furthermore, it is clear that the Royalty Adjustment Act of 1942 was intended to broaden and not to limit the Court of Claims Act. The legislative history of the former Acts shows this to be true. See Report of Senate Committee on Patents No. 1640; 77th Cong., 2nd Sess.; Report of hearing before House Committee on Patents October 13–15, 1942, in re H.R. 7620; Bulletin of the Judge Advocate General of the Army, Vol. 2, No. 2, February, 1943, pages 75, 76.

Wood v. Atlantic Gulf & Pacific Co., D. C., 296 F. 718, upon which plaintiff strongly relies, is distinguishable on its facts. There, the defendant-contractor, in conducting a dredging operation for the Government, used a so-called "Wood" runner covered by the patent there in suit. The defendant-contractor had the option of using this or other means for carrying out the dredging operation. The patented invention was not embodied in any product delivered to the Government, nor was it manufactured for the Government. Accordingly, the Court held that the defendant's use of it under the circumstances was not use for the government. In the present case the charge of infringement is directly against the very product that was manufactured expressly for, and actually used by the Government or subject to its control after manufacture.

■ Plaintiff claims, independently of its other grounds of opposition to the motion which we have just analyzed, that Defense Supplies Corporation is not to be treated as the Government, even though it was a wholly owned subsidiary of the Reconstruction Finance Corporation which in turn is wholly owned by the United States. Plaintiff contends that it is not sufficient to prove that this corporation is an instrumentality of the United States, especially since some of the alleged infringing gasoline supplied to it was ultimately sold to private persons. Plaintiff relies upon such cases as Reconstruction Finance Corporation v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595; United States v. Strang, 254 U.S. 491, 41 S.Ct. 165, 65 L.Ed. 368; Davis v. Elmira Savings Bank, 161 U.S. 275, 16 S.Ct. 502, 40 L.Ed. 700; Panama Ry. Co. v. Minnix, 5 Cir., 282 F. 47. But we find nothing in these cases that supports plaintiff's theory. The questions there were entirely different. A situation similar to the present one was presented in Southern Pacific Co. v. Reconstruction Finance Corporation, 9 Cir., 161 F.2d 56. There it was held that Defense Supplies Corporation was not an entity separate from the United States so as to preclude allowance of reduced rates under the Transportation Act of 1940, 49 U.S.C.A. § 1 et seq., on motor benzol shipped by Defense Supplies Corporation over land-grant aided carriers and carriers which had entered into equalization agreements. The Court said, 161 F.2d 56, at pages 58–60: "Ownership by Supplies was tantamount to ownership by the United States. The very first paragraph of the charter by which the appellee [the Reconstruction Finance Corporation] created Supplies, stamps upon the latter an indelible Governmental brand: 'In order to aid the Government of the United States in its national-defense program, Reconstruction Finance Corporation hereby · declares: * * *.'

"No other purpose is set forth in this three-line preamble. The charter also lists six specific 'objects, purposes and powers of the Corporation', each of which is directly and obviously connected with national defense.

"Similar Federal corporations—some of them not so closely concerned with national defense—have been characterized by the Supreme Court as being Government agencies, functioning as Government instrumentalities, and standing in the place of the Government within the ambit of their delegated powers."

Then the Court, after reviewing numerous decisions construing the powers and operations of comparable Government corporations, stated: "Accordingly, from the charter of Supplies and from decisions construing that charter as well as those of comparable Government corporations, we conclude that there was such identity of interest and function between Supplies and the United States that ownership of the benzol by Supplies was equivalent to ownership by the United States.

\* \* \* \* \* \*

"In such a crisis, little importance is to be attached to the fact that 13.4% of raw material purchased primarily for the prosecution of the war, happened eventually to be manufactured into products sold for civilian uses pursuant to allocations by the War Production Board. Stock-piles amassed by the Army and the Navy in the defense of the nation are not to be scrutinized with a microscope when we seek to arrive at the general purpose of their accumulation."

■ Finally, we likewise find no merit in plaintiff's contention that to grant defendant's motion in the present case would be going contra to what the Supreme Court said in Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, namely, that summary procedures under Rule 56 of the Federal Rules of Civil Procedure, "however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution from complicated courses of legislation, contracting and practice." 334 U.S.

249, 256, 257, 68 S.Ct. 1031, 1034. The Court was speaking of a record relating to very involved and complicated facts requiring more adequate presentation than the record afforded. Such is not true in the present case. We are satisfied that a full hearing on the merits of the present case would not disclose, insofar as the precise issue presented by defendant's motion is concerned, any substantial facts not already disclosed, or would lead us to reach a different conclusion. Clearly, therefore, we have done precisely what the Supreme Court said in Sperry Gyroscope Co. v. Arma Engineering Co., supra, a District Court must do in a case of this sort, i. e., assume jurisdiction and determine the question of the applicability of the Court of Claims Act.

Accordingly, for the reasons herein given, defendant's motion for summary judgment is granted.