Mr. Mac Dodson, President Arkansas Development Finance Authority 100 Main, Ste. 200 P.O. Box 8023 Little Rock, AR 72203-8023
Dear Mr. Dodson:
You have presented the following questions for my opinion:
 What is the impact on Amendment 60 of the Arkansas Constitution of the Federal Reserve's recent final amendments to Regulation A? What is the propriety of utilizing the new primary rate as opposed to the secondary rate as a replacement for the "Federal Reserve Discount Rate" that is referenced in Amendment 60?
BACKGROUND
Before responding to your questions, I will set forth the background events and applicable provisions of law (and changes thereto) that have given rise to these questions. A full explanation of Regulation A, in both its current and its amended versions, will be necessary to an adequate response to your question.
I will begin by reciting the pertinent language of Amendment 60 of the Arkansas Constitution. It states:
 (a)(i) The maximum lawful rate of interest on any contract entered into after the effective date hereof shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate at the time of the contract.
* * *
 (c)(ii) "Federal Reserve Discount Rate" means the Federal Reserve Discount Rate on ninety-day commercial paper in effect in the Federal Reserve Bank in the Federal Reserve District in which Arkansas is located.
Ark. Const., Art. 19, § 13 (as amended by Amendment 60).[1]
The "federal reserve discount rate," referred to in Amendment 60, above, is a rate of interest that is permitted under the version of the Federal Reserve Board's "Regulation A" that is currently in effect (until January 9, 2003). Regulation A (12 C.F.R. Part 201) creates and describes the Federal Reserve System's "discount window programs," which are designed to assist depository institutions in meeting temporary liquidity needs. Under these programs, various credit options are available to depository institutions in transactions for such purposes with the Federal Reserve Banks. Among these options are: (1) adjustment credit (very short-term, usually overnight), see 12 C.F.R. § 201.3(a); (2) extended credit (somewhat longer-term), see 12 C.F.R. § 201.3(c); and (3) seasonal credit, see 12 C.F.R. § 201.3(b). The Federal Reserve Banks are permitted to charge interest rates for adjustment credit in an amount that is discounted from the Federal Open Market Committee's target federal funds rate (i.e., the inter-bank overnight rate). See 12 U.S.C. § 357;12 C.F.R. §§ 201.5(c), 201.3(a). This discounted interest rate that has been permitted for adjustment credit is, in essence, the "federal reserve discount rate" that is referred to in Amendment 60. Interest rates for extended and seasonal credit are set by formulas based on market interest rates, and are typically at or above the discount rate for adjustment credit. See 12 C.F.R. §§ 201.3(b)(c).
These discount window programs have required substantial administration because of their various prerequisite requirements. For example, the programs generally require that depository institutions exhaust other sources of funding before applying for discount window credit, so as to minimize the incentive to exploit the spread that occurs between the discounted rate and higher market rates. The programs also require that institutions explain their need for the credit. The use of the funds is restricted; discount window credit cannot be used to finance the sale of federal funds. See generally 12 C.F.R. Pt. 201. As a result of requirements such as these, the Federal Reserve Banks must evaluate each institution's financial situation and proposed use of the funds. The Federal Reserve Board has expressed concern that these administrative requirements have impacted the effective operation of the programs. In addition, concern has been expressed that the programs' effectiveness has been impacted by other matters, such as an apprehension about the stigma resulting from the exhaustion-of-funding requirement, and the resulting impact on the volatility of the market. In order to streamline the programs to allow for lighter administration, and to address these other issues, the Federal Reserve Board recently proposed a new Regulation A, which replaces the adjustment and extended credit discount window programs, and leaves the seasonal credit program in place. See67 F.R. 36544. The Board has now adopted a final version of the new Regulation A, which will go into effect on January 9, 2003. See67 F.R. 67777.
Under the new Regulation A, various credit programs are available to depository institutions: (1) primary credit; (2) secondary credit; and (3) seasonal credit. (The Regulation also establishes a special procedure for quickly lowering the primary rate in the event of an emergency.) Primary credit will be available to generally sound institutions[2] for a very short term, usually overnight, without any requirement that the institution exhaust other sources of funding (or for longer periods of up to a few weeks to generally sound institutions that cannot obtain funding in the market). Moreover, the institution need not explain its need for the credit or its proposed use of the funds. The interest rate for primary credit will be a rate above the target federal funds rate. This rate will initially be 100 basis points above the federal funds rate, and will be regularly adjusted by the Federal Reserve Banks (at least every two weeks), subject to the approval of the Federal Reserve Board, by the same process that is currently used to establish the discount rate. See12 U.S.C. § 357. Institutions that do not qualify for primary credit can apply for secondary credit to meet temporary funding needs, provided that the institution makes a timely return to reliance on market funds. Secondary credit can also be used to facilitate the resolution of an institution's serious financial difficulty. The rate of interest for secondary credit is to be 50 basis points above the primary credit rate.
The new Regulation A does not use the term "Federal Reserve Discount Rate" that is used in Amendment 60 of the Arkansas Constitution. It should be noted that the currently effective Regulation A does not use that term either. However, as explained above, the current Regulation A permits discounted rates. The rates provided for in the new Regulation A are not "discounted" rates. These changes in Regulation A thus raise the question of what should be deemed to constitute the appropriate usury limit under Amendment 60.
RESPONSE
The questions you have presented raise issues that can be resolved definitively only by amendment to the Arkansas Constitution, or by a court's interpretation of Amendment 60 in light of the new Regulation A. Until such a definitive resolution of these issues is forthcoming, it is my opinion, as explained more fully below, that the approach most consistent with Arkansas precedent would be to interpret the phrase "Federal Reserve Discount Rate," as used in Amendment 60, as being equivalent to the "primary credit" rate that is created by the new Regulation A.
As an initial matter, I must point out that I do not interpret the new "primary credit" and "secondary credit" to correspond respectively with the former "adjustment credit" and "extended credit." As indicated in the discussion of the new set of credit options above, the entire "discount windows program" has been revamped. Thus, it is conceivable that an institution that qualifies for "primary credit" under the new program may not have qualified for "adjustment credit" at the discount rate under the old program, and vice versa: an institution that may have qualified for "adjustment credit" under the old program may not qualify for "primary credit" under the new program. Because of the changes in the requirements for the different types of credit, and because of the changes in the formulas for determining the interest rates for each credit option, there simply is no direct correspondence between the credit options of the new program and those of the old program. For this reason, I cannot conclude as a matter of law that the new "primary credit" rate is simply a replacement of the old "adjustment credit" rate, that can easily be substituted in interpreting Amendment 60. Moreover, as previously indicated, it is clear that the new program does not provide for any "discounted" interest rate; there is no longer a "federal reserve discount rate," such as is referred to in Amendment 60 of the Arkansas Constitution. Accordingly, strict and literal compliance with Amendment 60 is legally impossible.
The Arkansas Supreme Court has, on at least one occasion, addressed the resolution of a situation in which strict compliance with a constitutional provision was legally impossible. In White, Governor v.Hankins, 276 Ark. 562, 637 S.W.2d 603 (1982), a taxpayer challenged the governor's appointment of a particular individual to the State Highway Commission, on the grounds that the appointment violated Amendment 42 of the Arkansas Constitution. Amendment 42 requires the appointment of five members to the State Highway Commission, and provides that "no two Commissioners shall be appointed from any single Congressional District." Ark. Const., Am. 42, § 2. When Amendment 42 became effective in 1952, Arkansas had six congressional districts, but following the 1970 census, it had only four congressional districts. Thus, the individual whom the governor had appointed to the Commission was from a congressional district that was already represented on the Commission. The lower court held that Amendment 42 had the effect of freezing the number of congressional districts at six, and that the governor's appointments should be made on the basis of those six districts that had existed in 1952.
The Arkansas Supreme Court reversed this holding. The court, following its earlier decision in Drennen v. Bennett, 230 Ark. 330, 322 S.W.2d 585
(1959), which involved a similar argument concerning Amendment 35 and the Game and Fish Commission, reasoned that the drafters of Amendment 42 were well aware that congressional districts fluctuate after each decennial census. The fact that the drafters tied the membership of the Commission to this fluctuating standard reflected their intent to insure equal representation on the Commission from all parts of the state, with an odd number constituting that membership (so as to avoid tie votes). The court acknowledged that literal compliance with Amendment 42's requirement that no two members be appointed from the same district was impossible. However, the court declined to conclude on the basis of this impossibility of compliance that this requirement should be deemed void or stricken from the amendment; rather, the requirement should be deemed not to control. The court also held that the requirement would again become effective and controlling if the state should ever have five or more congressional districts again.
It is clear that the Arkansas Supreme Court in White, Governor v.Hankins, supra, was guided primarily in its solution to the impossibility of strict compliance with Amendment 42 by looking to the intent and purpose of that amendment, rather to the literal meaning of the language of the amendment. In taking this approach, the court relied upon its own precedent of taking such an approach in interpreting Amendment 35 given the changes to the congressional districts. It is my opinion that if the Arkansas Supreme Court were now faced with the task of interpreting Amendment 60 in light of the changes to the Federal Reserve Board's Regulation A, it would take a similar approach. That is, I believe that the court would give primacy to the intent and purpose of Amendment 60, rather than to the literal meaning of the language of the Amendment.
If the court were to take such an approach to the interpretation of Amendment 60, I believe that it would conclude that the intent and purpose of Amendment 60 would be best effectuated by relying on the new "primary credit" rate to calculate the usury limit in Arkansas. The purpose of Amendment 60 was clearly to place a limit on interest rates. By tying this limit to a fluctuating rate, rather than setting a fixed rate limit, it appears that the drafters intended to allow the interest rate limit to correspond in some measure with market conditions. At the same time, it appears that the drafters intended to tie the rate to the lowest available federal rate, which at the time of the drafting of Amendment 60 was the "federal reserve discount rate." Although literal compliance with Amendment 60 is no longer possible because there is no longer a "federal reserve discount rate," all of the objectives of Amendment 60 can, in my opinion, be achieved by calculating the usury limit on the basis of the new "primary credit" rate under the amended Regulation A. Such an interpretation of Amendment 60 would achieve the goals of placing a limit on interest rates that corresponds in some measure with market conditions and that is tied to the lowest available federal interest rate.
I note that the alternative to this interpretation of Amendment 60 in light of the changes in Regulation A would be to conclude that because there is no longer a "federal reserve discount rate," there is no longer a basis upon which to calculate a usury limit in Arkansas, and that there is therefore now no limit on interest rates in Arkansas. Because of the Arkansas Supreme Court's heavy reliance on underlying constitutional intent and purpose in White, Governor v. Hankins, supra, and in Drennenv. Bennett, supra, I believe that the court would decline to employ such an interpretation, because its results would be so patently antithetical to the intent and purposes of Amendment 60.[3]
Finally, I point out that the interpretation I have suggested is consistent with certain relevant rules of statutory construction that have been applied by the Arkansas Supreme Court. (Rules of statutory construction have been held to apply equally to the interpretation of constitutional provisions. Gazaway v. Greene County Equalization Bd.,314 Ark. 569, 864 S.W.2d 233 (1993).) The court has held that if a statute incorporates another statute by reference, and the incorporated statute is later repealed or amended, that repeal or amendment will not defeat the operation of the incorporating statute. See Bolar v. Cavaness,271 Ark. 69, 607 S.W.2d 367 (1980); Byrd v. Short, 228 Ark. 369,307 S.W.2d 871 (1957); Howard v. State ex rel. Stuckey, 223 Ark. 634,267 S.W.2d 763 (1954). Accord, U.S. v. Rainwater,244 F.2d 27 (8th Cir. 1957), aff'd356 U.S. 590 (1958).
I reiterate that the issue you have raised can be resolved definitively only by amendment to the Arkansas Constitution, or through the interpretation of a court. Pending such a resolution of the issue, I believe that the interpretation I have suggested is most consistent with Arkansas precedent and is the approach the Arkansas Supreme Court would take on the basis of that precedent if faced with the issue.
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
[1] I note that other provisions of law incorporate Amendment 60's usury limit, or refer to the "federal reserve discount rate." See, e.g.,
Ark. Const., Am. 65; A.C.A. §§ 6-20-1206; 14-164-303; 14-164-311.
[2] Institutions will be evaluated for general soundness under a system-wide set of criteria to be developed by the Federal Reserve Banks.
[3] I also note that another alternative would be to apply the new "secondary credit" rate, rather than the "primary credit" rate, in place of the old "federal reserve discount rate." I believe that if the goal is to find a solution that most nearly achieves the apparent goals of Amendment 60, such an approach would be counter-intuitive, in light of the fact that the new "primary credit" rate is the one that is most similar to the old "federal reserve discount rate."